COURT OF APPEALS OF VIRGINIA

Present:    Judges Kelsey, Alston and Senior Judge Annunziata
Argued at Richmond, Virginia


THOMAS POPE, JR.
                                                                        OPINION BY
v.       Record No. 2558-10-2                          JUDGE ROSSIE D. ALSTON, JR.
                                                                        JULY 31, 2012
COMMONWEALTH OF VIRGINIA


                FROM THE CIRCUIT COURT OF GREENSVILLE COUNTY
                                    W. Allan Sharrett, Judge

            Connie Louise Edwards (Connie Louise Edwards, P.C., on briefs),
            for appellant.

            John W. Blanton, Assistant Attorney General (Kenneth T.
            Cuccinelli, II, Attorney General, on brief), for appellee.


        Thomas Pope, Jr. (appellant) appeals his convictions for rape and first-degree murder.

He assigns a mixture of eight errors to the trial court's judgment encapsulated as follows:  1) a

Batson challenge; 2) chain of custody; 3) hearsay evidence; 4), 5), and 6) presentation of the

database match probability statistic; 7) DNA certificates of analysis; and 8) a post-trial motion

for a subpoena *duces tecum*.  Finding no error in any aspect that appellant alleges, we affirm his

convictions and sentence.

                                        BACKGROUND

        Viewing the evidence in the light most favorable to the Commonwealth, as we must

when the Commonwealth prevails at trial, see Maxwell v. Commonwealth, 275 Va. 437, 442,

657 S.E.2d 499, 502 (2008), the evidence indicated that a woman was raped and strangled in her

home in Emporia, Virginia, on January 2, 1975.  Despite her injuries, the victim managed to call

911 and report that she had been assaulted.  When Emporia Police Lieutenant Clyde Harrell

(Harrell) arrived at the victim's house, he found the eighty-eight-year-old woman seated in a chair, nude from the waist up. She told Harrell that "a negro man had torn her clothes off and had choked her." Because the victim was in a state of shock and having difficulty breathing, Harrell did not ask her any more questions while they waited for an ambulance to arrive. The victim was transported to the hospital where she died approximately one hour after she reported the attack.

Harrell "obtained all the evidence that [he] could find in helping to solve this case" from the victim's residence. The next day, January 3, 1975, Virginia State Police Trooper T.J. Roseberry, II (Trooper Roseberry) collected the evidence from Harrell and identified each item in his notes: "A[,] panties; B, slips, plural, two of them; C, a blouse, flowered, red, green, and brown"; and a piece of rug that Harrell cut out.[1] Trooper Roseberry then went back to the victim's home and collected additional evidence. Trooper Roseberry secured all the evidence in his cruiser and took it to the state laboratory on January 10, 1975.

Joan Faunce, an employee of the Division of Forensic Science ("DFS")[2] in 1975, received the evidentiary items directly from Trooper Roseberry. In her examination of the items, Faunce detected sperm, spermatozoa, and seminal fluids on a number of them. Faunce also received vaginal and cervical smears from the victim via Dr. Wiecking of the Medical Exam Section of the Division. Faunce identified the possible presence of seminal fluid in the vaginal smears. Faunce performed a serological[3] examination of the fluids. Curtis Jasper Moore was

---

[1] There is nothing in the record to suggest that anyone other than Harrell had the items that he recovered prior to turning them over to Trooper Roseberry.

[2] The Division of Forensic Science was later renamed the Department of Forensic Science.

[3] Faunce conducted a serological examination because DNA testing was not available in 1975.

later developed as a suspect in the attack, but the evidence of the serological examination did not implicate Moore because he was a non-secreter.[4] When Faunce completed her testing of each item, she placed the sample on the appropriate laboratory worksheet and secured the sample to the sheet with "Scotch" tape. Once Faunce finished with each piece of evidence, she returned that piece to Trooper Roseberry but for the sample taped to the worksheet. The worksheets were retained by DFS with the case file. Faunce never worked with the case file again.

Within one week of the rape and murder of the elderly victim, police questioned Moore about his possible involvement in the crimes. Moore eventually confessed and was tried and convicted. His conviction was later overturned when a federal court granted his petition for a writ of habeas corpus, holding that his confession was obtained in violation of his Fifth Amendment rights. See Moore v. Ballone, 488 F. Supp. 798, 808 (E.D. Va. 1980).[5]

The police investigation of the crimes remained open and unsolved, and on June 20, 1986, DFS eventually sent its case records to the State Record Center of the Library of Virginia for storage.

In 2005, Governor Warner ordered a review of all the serology case files worked between 1973 and 1988. The purpose of this review was to locate files that contained evidence and, in cases where the listed suspect was convicted, to have DNA testing conducted on that evidence. As a result of that order, the evidentiary samples from this victim's rape and murder were removed from storage by DFS on June 4, 2007, and sent to a contract laboratory, Bode Technology ("Bode"), for analysis. Analysts at Bode extracted and amplified DNA present in the vaginal smear and oral swab taken from the victim in 1975 to develop a profile of the

---

[4] A non-secreter does not produce a water-soluble form of his blood type, and his body fluids cannot be used to determine his blood type for comparison.

[5] Moore passed away at some point prior to 2008.

- 3 -

victim's DNA. The same analysts extracted and amplified DNA from the evidence that Faunce affixed to her worksheets to develop a DNA profile of the perpetrator. The lead analyst prepared a report on the analysis and sent the report, the generated data, and the evidence back to DFS.

Lisa Schiermeier-Wood, a senior analyst at DFS, received the report and the data. She reviewed the data and the analysis done at Bode, formed her own conclusions, and wrote an additional report summarizing her conclusions. As part of Schiermeier-Wood's report, she generated a certificate of analysis which included a profile of the victim's DNA and the DNA of her assailant. Schiermeier-Wood then searched the Virginia database of convicted felons' DNA profiles. From this search, she identified a DNA profile of appellant that was consistent with the DNA profile of the victim's assailant. Next, Schiermeier-Wood requested and obtained a buccal swab from appellant and developed a DNA profile of him that she compared to the previously developed evidentiary profile. Schiermeier-Wood concluded that appellant could not be eliminated as the contributor of the DNA from the crime scene. She performed a statistical analysis of the evidentiary DNA profile and determined its rarity: 1 in 1.1 billion in the Caucasian population, 1 in 81 million in the African-American population, and 1 in 1.7 billion in the Hispanic population. Schiermeier-Wood's analysis led to appellant's indictment for the rape and murder of the victim. On August 11, 2008, appellant was arrested.

A. Motion to Suppress DNA Evidence – Challenge to Certificates of Analysis

On March 19, 2009, appellant filed a motion to suppress the certificate of analysis dated July 21, 2008, that Schiermeier-Wood produced and signed. In his motion, appellant asserted that this certificate did not comply with the requirements of Code § 19.2-187 because it was not signed by the person who performed the examination of the DNA.

In late April 2009, the trial court held a hearing on the motion to suppress. In his opening statement at the hearing, appellant referred to an additional certificate of analysis dated August

20, 2008, and argued that DFS had impermissibly created its own definition of what it means to "analyze" the data. Specifically, he contended that the person who signed the certificates, Schiermeier-Wood, did not do the actual testing and analysis of the data (the actual analysis was done at Bode, according to appellant), but rather merely reviewed the work and signed the certificates. The Commonwealth argued that Schiermeier-Wood did indeed conduct the analysis consistent with statutory requirements by analyzing the data prepared by other technicians and scientists.

Schiermeier-Wood was the only witness to testify at the suppression hearing and stated that Bode did the laboratory work as described above. Specifically, she testified that Bode did the laboratory work to develop the DNA profiles and sent the data back to DFS for review and analysis. She further testified that she reviewed images of the DNA profiles along with numerical interpretations of the profiles that Bode created. As part of her review of the data, Schiermeier-Wood explained that she examined the DNA process performed at Bode, including reviewing the DNA profiles to determine if she agreed with Bode's interpretations, which she did. Schiermeier-Wood testified that after coming to this conclusion, she compared the DNA profiles generated from the evidence with a known DNA profile of the victim. In conducting this comparison, Schiermeier-Wood said she determined that there was a foreign DNA profile in the evidence. The July 21, 2008 certificate of analysis was based on this work.

She further testified that her search of the Virginia convicted offender DNA database returned appellant's name as an individual who had a profile consistent with the foreign DNA profile developed from the evidence. As noted above, Schiermeier-Wood further stated that she requested and received a fresh buccal swab from appellant to compare to the foreign DNA profile developed from the evidence. Working with other DFS employees, she developed a DNA profile of appellant from the buccal swab. She testified that the August 20, 2008 certificate

of analysis was based on this work and reflected her conclusion that appellant's new DNA profile, along with his profile in the database, was consistent with the foreign DNA profile from the victim's rape and murder.

Schiermeier-Wood went on to testify that DFS and Bode are accredited laboratories and that the protocol DFS uses is a commonly accepted protocol within the scientific community. She stated that her work, as is all analysis at DFS, was peer-reviewed by other analysts and that her work required an expert to interpret DNA data like the data she received from Bode. As part of the accreditation process, Schiermeier-Wood explained that DFS maintains a quality control manual that *inter alia* defines terms for use in DNA analysis. During her testimony, Schiermeier-Wood read the definition in the manual for "examination[:]" "the act or process of conducting or evaluating analytical procedures and tests that contribute to reaching a finding." She also read that an "examiner" is "an employee who performs examinations on and/or develops findings or conclusion [sic] concerning physical evidence, prepares and signs reports, and testifies in Court as required." She concluded her testimony by stating that she signed the certificates of analysis in question based on the work that she had done and on these definitions.

After Schiermeier-Wood's testimony, appellant argued that the July 21, 2008 certificate was not properly signed because Schiermeier-Wood admitted that she did not conduct the examination of the evidence. Appellant further contended that Schiermeier-Wood merely certified that the analysis had been done properly at Bode. The Commonwealth responded that Schiermeier-Wood, an expert in the field, properly signed the certificate because she evaluated the data and conducted an analysis of it beyond what was done with the evidence at Bode.

Denying the motion to suppress, the trial court found that it was guided by Code § 19.2-187 and that Schiermeier-Wood did perform an analysis. As the basis for its conclusion, the trial court found that Schiermeier-Wood analyzed the data, examined the data, and reached

her conclusions based upon those endeavors.  The trial court concluded that because the results in the certificates of analysis were the results of Schiermeier-Wood's analysis she was the appropriate person to sign both of them.

### B.  Pretrial Motion for Presentation of DNA Statistics

After an article appeared in the local newspaper mentioning that appellant was a convicted sex offender, appellant filed a motion to change venue and a motion *in limine* to present the database match probability (DMP) statistic to the jury.  At a hearing on both motions, the trial court took the venue motion under advisement pending jury selection.  Regarding DMP, appellant stated that he wanted "to get before the jury the alternative calculation of the statistics, [DMP,] that [is] relevant and pertinent in this case."  Appellant advised the trial court that DMP is an alternative calculation to random match probability (RMP) statistics, which are generally used in DNA cases.  Appellant supported his argument for DMP by pointing to its first appearance in a 1996 publication from the National Research Council of the National Academy of Science, The Evaluation of Forensic DNA Evidence, National Academy Press, 1996 (NRC II).  In the publication, DMP was suggested as the appropriate statistic to be used when a suspect is developed by a search of a DNA database because DMP takes RMP and multiplies it by the number of samples contained in the database.

During this same hearing, the Commonwealth advised the trial court that although DFS follows most of the guidance from the NRC, DFS does not use DMP even in "cold hit" cases. [6] Appellant argued to the trial court that his court-appointed DNA expert also did not use DMP, nor was it clear that he was familiar enough with the arguments for and against using DMP in "cold-hit" cases.  Appellant requested that the trial court allow him to identify a new expert who

---

[6] "Cold-hit" is the term given when a suspect is identified as a result of a DNA evidentiary profile "matching" a DNA profile contained in a DNA database.

- 7 -

would be competent to testify about DMP. The trial court granted this request and continued the decision on the merits of the motion to another hearing.

At the second hearing on DMP, both counsel informed the trial court that they had been unable to find any case law regarding the issues associated with the appointment of an individual with expertise in DMP or any authority recognizing DMP as scientifically accepted. During argument, appellant stated that the science underpinning both DMP and RMP is the same; they are "just competing theories over what is the appropriate question to be asked." Appellant argued that he had a particularized need for this statistic and an expert on this subject because DMP "accurately expresses the probability of obtaining a 'cold-hit' from a search of a particular database." Further, he contended that there was a large difference in the probability statistics generated by RMP and DMP in the instant case. Finally, he presented a letter from his proposed DMP expert, Dr. Charles Taylor, which stated in pertinent part, "[t]he statistical and population genetics community has not been able to come to a satisfactory agreement about which [statistic, DMP or RMP] is best at this time."

Denying the motion, the trial court ruled that it could not and did not "make a threshold finding of fact with respect to the reliability of the scientific method offered and it is not of a kind [so] familiar [and accepted as] to require no foundation to establish its fundamental reliability." The trial court denied the motion based on: 1) the statement in Dr. Taylor's letter; 2) the court-appointed DNA expert's lack of familiarity with DMP; 3) DFS's decision not to use DMP; and, 4) the absence of any Virginia court having found DMP reliable.

### C. Pretrial Motions for Change of Venue and *Batson* Challenge

A jury trial commenced on March 22, 2010. Thirty-three persons were called to make up the *venire*. During *voir dire*, twenty-three of the thirty-three veniremen admitted that they had heard about the case from the media or some source. Four of those veniremen were struck for

cause for several comingled reasons regarding each by stipulation of the parties. Two others were struck for cause. Neither the Commonwealth nor appellant opposed those strikes for cause. Appellant then made a general motion to strike the jurors who had read about the case because as the evidence unfolded, the contents of the newspaper articles could be triggered and taint the proceedings. During this argument, appellant also renewed the previously unadjudicated pretrial motion for a change of venue. The trial court denied the motion to strike the jurors who had read about the case in the media, but once again held open the motion for a change of venue.

The Commonwealth used four of its peremptory strikes to strike four black women, including Ms. Bonnie Lee. Because appellant is a black man and the Commonwealth struck four black veniremen, appellant raised a challenge to the striking of these jurors pursuant to Batson v. Kentucky, 476 U.S. 79 (1986). The Commonwealth responded that within the last several years it had prosecuted three of the four black women that it struck for various misdemeanors. As to Ms. Lee, the Commonwealth stated:

> [COMMONWEALTH'S ATTORNEY]: Ms. Lee I struck because I had no information on her. On all the paperwork we received, she was the only one on here on the whole panel that I had no prior knowledge of or information on. She also did not answer any questions, which is fine, but it draws me to the fact that she did not read the paper, she has not heard anything about this case. It just drew my attention that she had not read anything or didn't appear – I had no knowledge about her, Your Honor, that was the reason for the strike. I had knowledge on every other person, either where they worked or some prior information given to us by the clerk's office.

The trial court and counsel then had the following exchange:

> [APPELLANT'S COUNSEL]: Juror Lee, no knowledge about her, we didn't have -- at least I didn't, I don't know whether she was able to get that, the no knowledge – the fact she didn't answer the questions, Your Honor, I don't -- I do kind of challenge that. I don't know how to be more specific than that.
>
> THE COURT: Well, you need to offer a reason as to why that explanation is a mere pretext or not supported by the evidence.

- 9 -

[APPELLANT'S COUNSEL]: Well, she didn't -- I don't recollect that she did answer any questions that would bring attention to herself. But, Your Honor, that's a juror that you're lucky about, that they haven't read the paper and they haven't been contaminated by the case, so –

THE COURT: Well, the Court's not found --it's not left on any juror that's contaminated with the case, for the record.

[APPELLANT'S COUNSEL]: No, I wasn't trying to imply that.

THE COURT: Okay.

[APPELLANT'S COUNSEL]: But to say it's no knowledge and the fact she didn't answer positively to questions brought her attention to her, they were other people that didn't answer questions too and they were white.

THE COURT: The Court agrees with that. The inquiry where the Court focuses is that, according to the Commonwealth, Juror Lee was the only juror about whom she had no information because the juror apparently had not filled out a questionnaire or -- I don't know.

[COMMONWEALTH'S ATTORNEY]: It's not on my list.

THE COURT: Pardon me?

[COMMONWEALTH'S ATTORNEY]: It's not on the list that was provided to us by the clerk's office, so they either did not get her questionnaire back or not in a timely fashion.

THE COURT: Okay. You don't have any information on her?

[COMMONWEALTH'S ATTORNEY]: No, sir.

THE COURT: Okay. Do you wish to respond to that, [appellant's counsel]?

[APPELLANT'S COUNSEL]: No, Your Honor, I leave that.

The trial court overruled the Batson challenge, finding that the Commonwealth's explanations were race neutral and free of any inherent discriminatory intent.

- 10 -

## D. The Trial

After the jury was impaneled and counsel presented opening statements, the Commonwealth called Harrell, who, in the intervening thirty-five years since the victim's rape and murder, had retired from the police force as a deputy sheriff. Harrell, who had also suffered a stroke in the intervening years, testified that he remembered responding to the victim's house on the night of her death, but could not remember what he had done that night or what specific evidence he collected. Harrell stated that he remembered that he collected evidence and wrote a report about his actions and observations of that night. After testimony and argument outside the presence of the jury, the trial court admitted Harrell's report as a past recollection recorded and allowed it to be read to the jury. The report described Harrell's involvement in the case as recounted above and included the following statement, "I [Harrell] obtained all the evidence that I could find in helping to solve this case."

Before testimony from the Commonwealth's second witness, Trooper Roseberry, the trial court allowed counsel to address appellant's objection to Trooper Roseberry using certain portions of his original handwritten notes from the investigation into the victim's rape and murder. Trooper Roseberry's notes included information regarding the evidence he received from Harrell at the police station the day after the victim was attacked. The notes identified the items and listed where in the victim's home Harrell maintained that he found the items. Trooper Roseberry admitted that he made these notes after speaking with Harrell and did not have any additional personal knowledge regarding those items of evidence and their original locations within the victim's home. Appellant objected to this portion of Trooper Roseberry's notes, stating: "Your Honor, I guess basically it comes in – it's a hearsay thing again because this information as to where the items were located were [sic] told to him by . . . Harrell." Appellant added, "So I guess I would object to it on those grounds because he would not know and also he

can't testify to where they were kept for that day, I guess." After the trial court and counsel examined Trooper Roseberry outside the presence of the jury regarding the elements of past recollection recorded as pronounced in Ashley v. Commonwealth, 220 Va. 705, 261 S.E.2d 323 (1980), the trial court overruled appellant's objection.

In the presence of the jury, Trooper Roseberry testified to his involvement in the investigation based on his notes, which were never admitted into evidence. Trooper Roseberry testified that he arrived at the Emporia Police Department on January 3, 1975, and was briefed on the crimes. Trooper Roseberry stated that after the briefing, Harrell turned several items of evidence over to Trooper Roseberry and told him that he collected those items in specific locations of the victim's house. Trooper Roseberry testified that Harrell "gave [him] -- on [the] list it's noted number 5A panties; B, slips, plural, two of them; C, a blouse, flowered, red, green, and brown": and item 10 a piece of rug that Harrell cut out. Trooper Roseberry testified from the same notes about additional items of evidence he collected on January 3, 1975, when he went back to the victim's house: item 6, a pillow from a chair; item 7, bottom bedding from the victim's bed; item 11, the rug from which item 10 was cut. After collecting these items, Trooper Roseberry stated that he kept all the items locked in his state police vehicle until he personally delivered the items to the state laboratory on January 10, 1975. He testified that no one else had keys to his vehicle, and no one else was inside the vehicle during the week he stored the items there. Trooper Roseberry further testified that appellant had never been in his police vehicle.

Following Trooper Roseberry's testimony, Faunce testified for the Commonwealth regarding her work with the evidence for DFS shortly after the crime occurred in 1975 as noted above.

Prior to bringing the jury out on the second day of trial, the trial court entertained appellant's motion to exclude the DNA evidence, arguing that the chain of custody had not been

established for the physical evidence that DFS analyzed to produce the DNA evidence.

Appellant argued that because Harrell could not remember what he collected, or what he did with the evidence before turning it over to Trooper Roseberry the next day, a "vital link" was missing in the chain of custody, which required the trial court to exclude the DNA evidence. Denying the motion, the trial court stated:

> All right. Trooper Harrell excuse me, Sheriff Harrell, then Lieutenant Harrell, testified that he collected the crime scene evidence and he turned it over to Trooper Roseberry. He was not specific and could not recall the exact things that he collected. Trooper Roseberry testified -- he verifies Harrell's testimony and testified that he collected the items that Harrell turned over to him. He made notes contemporaneous with that, the originals to which still exist and to which Trooper Roseberry referred yesterday listing the items that he received.
>
> We're talking about DNA. We're talking about our biological fluid with DNA. If it brushed up against something, it might destroy DNA but it's not going to remake it into something. It's not going to remake one person's DNA into some other person's DNA. It might make it impossible to find -- determine if there is any DNA to be recovered but it's not -- it can't morph it or change it from one person's DNA into someone else's DNA. In looking at a chain of custody, the Court looks at -- and I agree with the defense that the Court really is a gatekeeper in this, it has to make certain that there is a sufficient chain of custody to give reliability to the investigation, it can't allow that to go to the jury.
>
> And in looking at this particular set of facts, the testimony as it was, and what we're looking at and looking for, the Court believes that the Commonwealth has established sufficient reliability in the integrity of the evidence-gathering process and the preservation of the particular material for it to continue – I'm not going to rule it admissible at this point because we haven't had the rest of it, but for it to continue with its chain of custody pursuit. We've got it to Roseberry. We've got it to the lab. We've got it to the serologist. I think we've got it that far anyhow.

After denying the motion, the trial court brought the jury back, and the Commonwealth called Kelli Lewis, a forensic casework supervisor and senior DNA analyst for Bode. Lewis qualified as an expert in DNA typing and analysis. Although she conducted some of the

laboratory processing for some of the DNA samples in this case, Lewis testified that she did not conduct any statistical analysis of the DNA in this case. On cross-examination, Lewis stated that she had done statistical analysis in other cases and had used two formulas when conducting DNA statistical analysis: RMP, for single-source profiles, and Combined Probability of Exclusion, for cases where there is more than one donor of DNA in a sample. Lewis noted that she uses RMP even when the case is a "cold-hit." When prompted by appellant's counsel, Lewis stated that she was familiar with DMP and had "read a little bit about it." She acknowledged that the NRC II report provides guidelines to laboratories which conduct DNA statistical analysis and recommends using DMP when a suspect is found through a search of a DNA database. Lewis read from the report that DMP is calculated by multiplying RMP by N, the number of individuals in the database.

The Commonwealth then called Schiermeier-Wood to testify about her analysis of the DNA and statistical calculations. She testified consistently with her testimony at the pretrial hearing on direct examination. On cross-examination and outside the presence of the jury, Schiermeier-Wood stated she was familiar with the recommendations in the NRC II and that the NRC II is a set of guidelines for the forensic community. She further testified, however, that DFS does not follow all of the guidelines, and specifically, DFS does not calculate DMP. When questioned about what question DMP answers, Schiermeier-Wood stated that it was her understanding, based on a 2009 scholarly paper, that DMP truly estimates the expected number of replicates of such databases in which this profile is expected to be found. She also stated that she had never used DMP and was unaware of anyone in Virginia using DMP.

The trial court again ruled that it would not allow evidence concerning DMP because DMP "has not been accepted ever in a court in Virginia." The trial court also noted that DFS has never used DMP, and observed that even appellant's proposed expert, Dr. Taylor, stated that the

- 14 -

DNA statistics community had not come to a satisfactory agreement on which statistic is best to use.

The Commonwealth rested its case-in-chief following Schiermeier-Wood's testimony, and appellant presented the following stipulations: 1) the population of Virginia on July 1, 2009, was 7,882,590; 2) the victim called the police at 7:48 p.m. on January 2, 1975, and stated that she needed help, had been robbed and choked. She wanted the police to come and remove her assailant from her house as she could not leave because her assailant had stripped her and raped her. She described her assailant as a middle-aged Negro man; 3) appellant was nineteen years old on January 2, 1975; 4) appellant and Curtis Jasper Moore were not related; 5) appellant has male relatives, a father, brothers, uncles, and cousins of various degrees both living and deceased. Appellant also introduced a transcript of a police interrogation of Moore and a sheriff's testimony at Moore's trial for the victim's rape and murder.

Appellant did not call any witnesses, nor did he move to strike the Commonwealth's evidence. The Commonwealth did not introduce any evidence in rebuttal.

The trial court instructed the jury and released them to deliberate after counsel gave their closing arguments. The jury found appellant guilty of the victim's rape and murder in the first degree and recommended life imprisonment plus thirty-five years, along with a $100,000 fine.

### E. Post-trial Motion for a Subpoena *Duces Tecum*

Prior to appellant's sentencing hearing before the trial court, appellant filed a request for a subpoena *duces tecum*, seeking additional information about the analysis of DNA from Item #5 (victim's slip). In an affidavit filed with the request, counsel for appellant asserted that Schiermeier-Wood testified Item #5 "was run through NDIS [National DNA Index] and two candidate matches were produced" and that both of these candidate matches were eliminated. Counsel further averred that after trial she asked DFS to explain to her the basis for eliminating

- 15 -

these candidate matches. Counsel stated that she was unable to "get a straight answer" from DFS and became "concern[ed] that there has been a breach of Broady's [sic] requirements to disclose exculpatory evidence to the defendant." Appellant requested the subpoena to determine if a Brady[7] violation occurred because he believed that DFS's stated basis to exclude the candidate matches was inappropriate. Also attached to the motion was a letter from DFS which stated, "[The] eliminated NDIS candidates possess alleles not detected in the Item 5 profile and also lack alleles present in the item 5 profile."

The trial court held a hearing on the matter during which appellant contended that the response to his question from DFS concerning the basis for eliminating the candidate matches did not state a proper basis for eliminating the candidates. Specifically, appellant stated "neither one of these reasons is a reason for elimination." In response, the Commonwealth stated that the letter and the trial testimony clearly indicated why the two candidate matches were eliminated, but that the Commonwealth's Attorney was not personally aware of the method behind the elimination because she did not ask DFS to provide that to her. Appellant's counsel admitted that she and the court-appointed DNA expert had access not only to DFS's material for this case, but also DFS personnel and laboratories.

In response to questioning from the trial court, appellant's counsel stated, "[T]he concern of counsel is indeed that [the candidate matches] are samples that were not validly eliminated." Shortly thereafter, the trial court asked, "So defense does not have any argument that exculpatory evidence exists that has not been disclosed or that has been willfully withheld; is that correct?" Appellant's counsel replied, "I have not filed a Brady motion." Counsel also confirmed that she had access to the DFS laboratory, actually went to the laboratory, and had access to the DFS scientists who testified at trial. When asked by the trial court if the Commonwealth possessed, to

<hr>

[7] Brady v. Maryland, 373 U.S. 83 (1963).

the best of its knowledge, any evidence subject to disclosure under Brady, the Commonwealth replied, "No, sir." The trial court denied the request for a subpoena, holding that appellant had failed to meet the requirements for demonstrating a Brady violation.

The trial court later sentenced appellant consistent with the jury's recommendation to life imprisonment plus thirty-five years. This appeal followed.

## ANALYSIS

### A. *Batson* Challenge

Appellant argues that the trial court erred in denying his Batson challenge to the Commonwealth's decision to strike Ms. Lee from the jury. Under this assignment of error, appellant acknowledges that he failed to properly preserve his challenge to this ruling at trial and requests that we apply one of the exceptions to Rule 5A:18.[8] Assuming without deciding that appellant has properly requested that we apply either the "ends of justice" or "good cause" exception to Rule 5A:18, we nevertheless find the issue waived.

Initially we note that the ends of justice exception "is narrow and is to be used sparingly." Brown v. Commonwealth, 8 Va. App. 126, 132, 380 S.E.2d 8, 11 (1989). "In order to avail oneself of the exception, a defendant must affirmatively show that a miscarriage of justice has occurred, not that a miscarriage *might* have occurred." Redman v. Commonwealth, 25 Va. App. 215, 221, 487 S.E.2d 269, 272 (1997) (citing Mounce v. Commonwealth, 4 Va. App. 433, 436, 357 S.E.2d 742, 744 (1987)). To establish that a clear miscarriage of justice has occurred, an appellant must demonstrate that he was convicted for conduct that was not a criminal offense or

---

[8] On brief, appellant states that he "invokes Rule 5A:18" regarding this assignment of error. This imprecise statement does not specify the part of the rule appellant seeks to invoke. However, for the reasons stated below, even assuming appellant has properly invoked the "ends of justice" or "good cause" exceptions to Rule 5A:18, we find neither exception applicable.

the record must affirmatively prove that an element of the offense did not occur. Id. at 221-22, 487 S.E.2d at 273.

Appellant has not demonstrated that he was convicted for conduct that was not a crime, nor has the record proven that an element of one of the charged offenses did not occur. Accordingly, we decline to apply the ends of justice exception to reach the merits of this assignment of error.

Similarly, we find no legal basis to apply the good cause exception to Rule 5A:18. "'Good cause' relates to the reason why an objection was not stated at the time of the ruling." Campbell v. Commonwealth, 14 Va. App. 988, 996, 421 S.E.2d 652, 656 (1992) (*en banc*) (citing Murray v. Carrier, 477 U.S. 478, 488-89 (1968)). When a defendant has ample opportunity to bring his due process claim to the trial court's attention but fails to do so, the good cause exception does not apply. See Andrews v. Commonwealth, 37 Va. App. 479, 493-94, 559 S.E.2d 401, 409 (2002).

In addressing appellant's argument, we find Buck v. Commonwealth, 247 Va. 449, 443 S.E.2d 414 (1994), instructive. Buck was an African-American male on trial for possession of cocaine with intent to distribute. Id. at 450, 443 S.E.2d at 414. The Commonwealth struck two of three African-American potential jurors, one female and one male. Id. at 451, 443 S.E.2d at 414. In response to Buck's Batson challenge, the Commonwealth stated that it struck the female juror because she was relatively young, had no children, and the Commonwealth felt that jurors with children would be more inclined to convict a drug dealer. Id. As to the male juror, the Commonwealth stated that it struck him because he was inappropriately dressed for court – wearing an athletic jacket – and he lived in Petersburg, which has a significant drug problem. Thus, the Commonwealth believed he would be more "tolerant of this offense." Id. When given the opportunity to argue that these reasons were pretextual, Buck simply stated: "My concern

was that the jurors are not representative of the population.  There were three blacks on the panel.  We now only have one, and I would think more significant reasons than what was given should be shown." Id. at 452, 443 S.E.2d at 416.  The trial court overruled Buck's challenge, and he appealed.

On appeal, Buck argued for the first time that the Commonwealth's reasons were pretextual because there was another young, white, female juror who had no children, that the jury list showed that the African-American male juror had a Richmond address, and that there were five other non-African-American individuals on the list who had Richmond addresses but were not struck.  Additionally, according to Buck, the male juror's decision to wear an athletic jacket was appropriate dress for the beginning of winter when the trial occurred. Id. at 452, 443 S.E.2d at 415-16.  The Supreme Court held:

> Nothing in [his] statement informed the trial court that Buck believed that the reasons advanced were pretextual because they were inconsistently applied, nor did Buck's statement advise the court that the reasons were based on a mistake concerning an address, an improper assumption of toleration for drug-related crimes, or erroneous inferences drawn from the wearing of an athletic jacket.  Buck's failure to raise these arguments before the trial court precludes him from raising them for the first time on appeal.

Id. at 452-53, 443 S.E.2d at 416.

This particular discussion in Buck is analogous to the case at bar.  Just as Buck raised a Batson challenge to the Commonwealth's striking members of his own race from the jury, appellant raised a Batson challenge to the Commonwealth's striking of four African-American jurors from the jury.  Similar to the trial court in Buck, which gave Buck an opportunity to challenge the Commonwealth's stated reasons for striking the jurors, the trial court in this case gave appellant an opportunity to argue that the Commonwealth's stated reasons for striking Lee were pretextual.  And like Buck, who raised a distinctly different argument on appeal compared

- 19 -

with his statement at trial, appellant contends that the Commonwealth's stated reason for striking Lee – no information – was a pretext for its true reason, that Lee had not read the newspaper article revealing appellant's convicted sex offender status. Appellant admits on brief that he failed to make this argument at trial. Because appellant had an opportunity to present his argument to the trial court and failed to raise the specific argument that he now raises, the good cause exception does not apply. See Andrews, 37 Va. App. at 493-94, 559 S.E.2d at 409.

Finding no basis to apply either exception to Rule 5A:18, we deem this assignment of error waived and decline to address its merits.

### B. Chain of Custody

Under his second assignment of error, appellant argues that the trial court erred in "admitting the physical evidence and the DNA typing results obtained therefrom" because the items Harrell collected from the victim's home "were not enumerated, described, or identified in any specific way, nor do we know how they were handled, kept or stored" from the time that Harrell collected them until he turned them over to Trooper Roseberry the next morning. As an initial matter, our review of the record indicates that the Commonwealth never introduced the physical evidence items that DFS extracted DNA evidence from – the victim's slip, blouse, and panties. Thus, we will not consider that portion of appellant's assignment of error.

The determination on a chain of custody challenge lies within the trial court's broad discretion and will not be overturned on appeal absent an abuse of that discretion. See Crews v. Commonwealth, 18 Va. App. 115, 118, 442 S.E.2d 407, 409 (1994). We find that the trial court did not abuse its discretion under the circumstances of this case.

Although the Commonwealth is required to demonstrate evidence supporting every "vital link in the chain of custody" when introducing the results of chemical analysis of physical evidence items, Robinson v. Commonwealth, 212 Va. 136, 138, 183 S.E.2d 179, 180 (1971),

"the burden is not absolute that 'all possibility of tampering' be eliminated," id. (quoting People v. Riser, 305 P.2d 1, 10 (Cal. 1957)).  Moreover, "[a]ll that is required . . . to establish a chain of custody is that the Commonwealth's evidence 'afford reasonable assurance that the exhibits at trial are the same and in the same condition as they were when first obtained.'"  Pope v. Commonwealth, 234 Va. 114, 121, 360 S.E.2d 352, 357 (1987) (quoting P. Smith v. Commonwealth, 219 Va. 554, 559, 248 S.E.2d 805, 808 (1978)).  In the event that a gap in the chain of custody is shown, "'gaps in the chain [of custody] normally go to the weight of the evidence rather than its admissibility.'"  Aguilar v. Commonwealth, 280 Va. 322, 332-33, 699 S.E.2d 215, 220 (2010) (quoting Melendez-Diaz v. Massachusetts, 557 U.S. 305, 311 n.1 (2009)).

Appellant is correct that the Commonwealth's evidence demonstrated only that Harrell collected "all the evidence [he] could find" and that Harrell had custody of the items overnight before he gave them to Trooper Roseberry the next day.  However, under the circumstances of this case, we do not find that the trial court erred in concluding that Harrell's failure to enumerate the items in his report or state how he kept them overnight did not constitute a missing "vital link" in the chain of custody but rather went to the weight of the evidence.  See Robinson, 212 Va. at 138, 183 S.E.2d at 180.

To the extent that appellant has identified a "'gap'" in the chain of custody, the trial court properly concluded that this gap affected the weight accorded the evidence as opposed to its admissibility.  Aguilar, 280 Va. at 332-33, 699 S.E.2d at 220 (quoting Melendez-Diaz, 557 U.S. at 311 n.1).  Understandably, Harrell could not recollect exactly the items that he collected from

the victim's home over thirty-five years after he responded to her 911 call.[9] Additionally, Trooper Roseberry's testimony established that he received the items from Harrell the next morning and identified them specifically. Trooper Roseberry's testimony also demonstrated that the items were stored and kept properly until he delivered them to DFS one week later. Appellant has not challenged the chain of custody from the time that Trooper Roseberry obtained the items from Harrell; therefore, we see no need to examine the chain of custody beyond the morning of January 3, 1975, when Trooper Roseberry received the items from Harrell.

Because appellant simply identified an evidentiary "gap" in the evidence collection process instead of demonstrating any lack of assurance regarding the preservation of the evidence or identifying a missing "vital link" in the chain of custody, we find that the trial court did not abuse its discretion in overruling appellant's motion to exclude the analysis of DNA evidence obtained from the physical evidence items Harrell recovered.

### C. Hearsay Evidence

Appellant contends that the trial court erred in overruling his hearsay objection to Trooper Roseberry's testimony regarding what Harrell told him about the physical evidence Harrell collected from the victim's home. We decline to consider the merits of this argument for two procedural reasons. First, appellant failed to meet his burden to provide us with a record from which we can properly evaluate this alleged error, Smith v. Commonwealth, 16 Va. App. 630, 635, 432 S.E.2d 2, 6 (1993) (citing Justis v. Young, 202 Va. 631, 632, 119 S.E.2d 255, 256-57 (1961)). Moreover, referring to the plain language of appellant's assignment of error, as we must, we find the argument waived by appellant's failure to make a specific and contemporaneous objection to Trooper Roseberry's testimony. Rule 5A:12; Rule 5A:18.

---

[9] In addition to the passage of time, the Commonwealth informed the Court at oral argument that Harrell had suffered a stroke shortly before the trial and had passed away between the trial and the appeal.

As "[w]e have many times pointed out . . . the burden is on the appellant to present to us a sufficient record from which we can determine whether the lower court has erred in the respect complained of." Smith, 16 Va. App. at 635, 432 S.E.2d at 6 (citing Justis, 202 Va. at 632, 119 S.E.2d at 256-57). The record indicates that Trooper Roseberry was examined outside the presence of the jury to determine whether he could use his handwritten notes from the investigation during his testimony as a past recollection recorded. Appellant objected to a portion of the notes involving Trooper Roseberry's collection of certain physical items of evidence that he received from Harrell the day after the victim's rape and murder. Appellant's stated grounds were: "it's a hearsay thing again because this information as to where the items were located were [sic] told to him by . . . Harrell" and "because he would not know and also he can't testify to where they were kept for that day." Because Trooper Roseberry's notes were neither admitted into evidence nor made part of the record on appeal, we are unable to evaluate whether the document(s) actually contained *an out-of-court statement* by Harrell or simply Trooper Roseberry's *notations* about the items. It is unclear whether Trooper Roseberry's later testimony about this issue came directly from his notes instead of from his memory.

As opposed to simply reading his notes in the jury's presence, Trooper Roseberry used them as a reference during his testimony. Specific to the challenged portion of the notes, Trooper Roseberry testified:

> Like I said, I received those from Lt. Harrell at the Emporia Police Department. He gave me – on my list it's noted number 5A panties; B, slips, plural, two of them; C, a blouse flowered red, green and brown. I was advised by Lieutenant Harrell this was found in the living room between the front door and the front bedroom. He advised me that he collected these the evening before, which would have been January 2nd, 1975.

Rule 5A:18 requires that an appellant make a specific and contemporaneous objection to properly preserve an issue for appeal, otherwise this Court will deem the issue waived. Shelton

v. Commonwealth, 274 Va. 121, 126, 645 S.E.2d 914, 916 (2007) (citing Nusbaum v. Berlin, 273 Va. 385, 406, 641 S.E.2d 494, 503 (2007)). Appellant's objection outside the presence of the jury focused on the admission of the notes themselves, not Trooper Roseberry's expected testimony. Appellant then did not object to the alleged hearsay during Trooper Roseberry's testimony. Appellant's assignment of error refers to Trooper Roseberry's testimony, not his notes, and our review is limited to those errors specifically assigned by an appellant. See Rule 5A:12; Clifford v. Commonwealth, 274 Va. 23, 25, 645 S.E.2d 295, 297 (2007) (holding that an appellate court may not "recast" arguments). Because appellant failed to object at any point during or after Trooper Roseberry's testimony and his assignment of error specifically challenges the testimony versus the handwritten notes, we deem the argument waived under Rules 5A:18 and 5A:12.

### D. RMP versus DMP and Motion for DMP Expert

In appellant's contiguous fourth, fifth, and sixth assignments of error, he contends that the trial court erred in precluding him from introducing DMP, erred in allowing the Commonwealth to present only RMP, and erred in denying him an expert to assist in presenting DMP. We review the trial court's decision on each of these issues for an abuse of discretion. Herndon v. Commonwealth, 280 Va. 138, 143, 694 S.E.2d 618, 620 (2010) (admission of evidence); Dowdy v. Commonwealth, 278 Va. 577, 595, 686 S.E.2d 710, 720 (2009) (defendant's motion for an expert). Reviewing the trial court's determinations on these issues under that standard, we find no abuse of discretion.

It is well settled in Virginia that "[w]hen scientific evidence is offered, the [trial] court must make a threshold finding of fact with respect to the reliability of the scientific method offered, unless it is of a kind so familiar and accepted as to require no foundation to establish the fundamental reliability of the system." Spencer v. Commonwealth, 240 Va. 78, 97, 393 S.E.2d

609, 621 (1990). During the pretrial hearing on appellant's request to present DMP, the trial court denied the request because it could not make that "threshold finding of fact" about DMP's reliability. The trial court based this determination on four specific grounds: 1) the statement in Dr. Taylor's letter that the relevant scientific communities had been unable to come to a conclusion as to which statistic was most appropriate; 2) the court-appointed DNA expert's lack of familiarity with DMP; 3) DFS's decision not to use DMP; and 4) the absence of any Virginia court having found DMP reliable.

During appellant's jury trial, he was able to elicit testimony about DMP from two of the Commonwealth's witnesses. Both Lewis and Schiermeier-Wood read the NRC II's recommendation regarding DMP and how to calculate it. They agreed with appellant's previous arguments that the NRC II recommends using DMP in a cold-hit case but asserted that DFS does not follow that guidance. They both also asserted that DFS does not utilize DMP, nor were they aware of anyone in Virginia who regularly calculates DMP.

Outside the presence of the jury, Schiermeier-Wood further disagreed with appellant regarding what DMP purports to represent. Appellant repeatedly attempted to assert to the trial court that DMP validly calculates the probability of coincidentally finding a match between a DNA profile created from a crime scene sample and a DNA profile found in the Virginia convicted offender DNA database.[10] On redirect by the Commonwealth, Schiermeier-Wood asserted that she understood DMP to represent the probability of finding a match between a DNA profile created from a crime scene sample and the same DNA profile in databases with the same number of individuals as the Virginia convicted offender DNA database. The trial court

---

[10] On appeal, appellant relies upon Crews v. Johnson, 702 F. Supp. 2d 618 (W.D. Va. 2010), aff'd sub nom. Crews v. Clarke, 2011 U.S. App. LEXIS 24292 (4th Cir. 2011) (*per curiam*), for a discussion of the relevant terminology. We find Crews inapplicable in the context of the instant appeal.

again denied appellant's request to present this statistic to the jury, citing its previous conclusion that the evidence put forth did not satisfy the reliability requirement for presenting scientific evidence.

Faced with these disagreements, we find no error in the trial court's conclusion that appellant failed to establish a reliable foundation for introducing DMP without running the risk of confusing or misleading the jury. See Spencer, 240 Va. at 97, 393 S.E.2d at 621. Due to our determination that the trial court did not abuse its discretion in denying appellant's requests to present DMP, we necessarily find that the trial court did not err in denying appellant's motion for an expert on the same topic. Accordingly, we find no error as appellant has argued in assignments of error four, five, and six.

### E. Certificates of Analysis

Under his seventh assignment of error, appellant contends that Schiermeier-Wood was not the appropriate person to sign the July 21, 2008 certificate of analysis because she never worked with the physical evidence until February 2009 when Bode sent the samples back to DFS. Appellant further contends that Schiermeier-Wood merely reviewed the data and notes from Bode and then conveniently signed the certificate according to a DFS-created definition of the word, "examiner." We disagree.

"[T]he admissibility of evidence is within the discretion of the trial court and [an appellate court] will not reject the decision of the trial court unless [it] find[s] an abuse of discretion." Midkiff v. Commonwealth, 280 Va. 216, 219, 694 S.E.2d 576, 578 (2010) (citing Coe v. Commonwealth, 231 Va. 83, 87, 340 S.E.2d 820, 823 (1986)). Only when reasonable jurists could not differ [does this Court] say an abuse of discretion has occurred." Thomas v. Commonwealth, 44 Va. App. 741, 753, 607 S.E.2d 738, 743, adopted upon reh'g en banc, 45 Va. App. 811, 613 S.E.2d 870 (2005) (internal quotations and citations omitted). On appeal,

"[t]he burden is on appellant to show that the trial court's admission of evidence constitutes reversible error." Dunn v. Commonwealth, 20 Va. App. 217, 220, 456 S.E.2d 135, 136 (1995) (citing Johnson v. Commonwealth, 12 Va. App. 391, 396, 404 S.E.2d 384, 387 (1991)).

Code § 19.2-187 provides in part:

> In any hearing or trial of any criminal offense . . . a certificate of analysis of a person performing an *analysis or examination*, duly attested by such person, shall be admissible in evidence as evidence of the facts therein stated and the results of the analysis or examination referred to therein . . . when any such analysis or examination is performed in any laboratory operated by the Division of Consolidated Laboratory Services or the Department of Forensic Science or authorized by such Department to conduct such analysis or examination.

(Emphasis added). We have previously examined the purpose behind the General Assembly's enactment of this code section and its applicability in cases involving forensic evidence. "Code § 19.2-187 was enacted to allow into evidence a written report of an analysis or examination conducted by specified laboratories, without requiring that the technicians be present." Myrick v. Commonwealth, 13 Va. App. 333, 337, 412 S.E.2d 176, 178 (1991). In practice, it "provides a basis for admitting into evidence the results of an analysis performed by [DFS] . . . when the certificate showing the results is attested by the person who performed the test." Galbraith v. Commonwealth, 18 Va. App. 734, 740, 446 S.E.2d 633, 637 (1994).

Contrary to appellant's characterization of Schiermeier-Wood's testimony, Schiermeier-Wood conducted additional analysis of the DNA evidence after receiving the profiles that Bode developed. She testified that she first reviewed the DNA process and the profiles that Bode developed to determine whether she agreed with their interpretations of the data. Second, she interpreted the profiles and came to conclusions about whether appellant could be excluded as a contributor to the sample obtained from analysis of the physical evidence. Additionally, Schiermeier-Wood made calculations from the data to determine the rarity of

appellant's profile and the RMP statistic. When denying the motion to suppress the certificates, the trial court stated that Schiermeier-Wood's testimony fell squarely under the terms of Code § 19.2-187, because she testified that she analyzed and examined the data at issue, as the statute requires.

Reviewing the record, we find no error in this analysis. Code § 19.2-187 requires that the person who signs a certificate of analysis be the same person who conducted "an analysis or examination." Its plain language, however, does not require that the person who signs the certificate be the same person who performed each step of an examination or process that ends in the evidence being at a certain point where an expert such as Schiermeier-Wood can analyze it. Assuming without deciding that the "analysis" in this case was the process that led to Schiermeier-Wood's determinations that a foreign DNA profile was present in the samples from the physical evidence and that appellant's DNA profile was consistent with that foreign profile, admission of the certificates complied with Code § 19.2-187 because these conclusions are the substance of the certificates' contents.

Although the commonly accepted purpose of the statute is to allow the evidence to come in without requiring the presence of "technicians" at trial, see Myrick, 13 Va. App. at 337, 412 S.E.2d at 178; Galbraith, 18 Va. App. at 740, 446 S.E.2d at 637, Schiermeier-Wood was present at both the suppression hearing and at trial and thereby subject to cross-examination. Because the trial court followed Code § 19.2-187's plain language in denying the motion to suppress, we find no abuse of discretion and affirm the trial court's decision on this issue.

### F. Post-Trial Request for Subpoena *Duces Tecum*

Appellant contends that the trial court erred in denying his post-trial motion for a subpoena *duces tecum* for the results of the run of the crime scene sample through NDIS, the

national database, to determine if a <u>Brady</u> violation had occurred. We find no error in the trial court's determination on this issue.

"The trial court's refusal to issue a subpoena duces tecum . . . is not reversible error absent a showing of prejudice." <u>Gibbs v. Commonwealth</u>, 16 Va. App. 697, 701, 432 S.E.2d 514, 516 (1993) (citing <u>Conway v. Commonwealth</u>, 12 Va. App. 711, 716, 407 S.E.2d 310, 312-13 (1991) (*en banc*)). "[W]here the prosecution and defense are at an impasse in their respective views of the nature of the evidentiary materials," the trial court may conduct an *in camera* review of the evidence in its discretion. <u>Bowman v. Commonwealth</u>, 248 Va. 130, 135, 445 S.E.2d 110, 113 (1994) (citing <u>Pennsylvania v. Ritchie</u>, 480 U.S. 39, 60 (1987); <u>United States v. Agurs</u>, 427 U.S. 97, 106 (1976)). Thus, we review appellant's challenge under this assignment of error to determine whether the trial court abused its discretion. <u>Id.</u>

Factors for consideration when reviewing the trial court's exercise of discretion include: the defense's reasons for "justifying access to the disputed material, the time of the request, or the amount of material involved." <u>Id.</u> at 135-36, 445 S.E.2d at 113 (citing <u>Agurs</u>, 427 U.S. at 106). Keeping in mind that the burden is on the appellant to provide us with a record from which we can determine whether the trial court erred, <u>Oliver v. Commonwealth</u>, 35 Va. App. 286, 297, 544 S.E.2d 870, 875 (2001) (citing <u>Justis</u>, 202 Va. at 632, 119 S.E.2d at 256-57), all that can be reasonably discerned from this record is that appellant wanted to see the results of the search conducted through the national database to independently evaluate whether the two potential matches were validly eliminated.

Appellant attempted to support his argument with a scientific discussion about specific alleles involved in DNA testing but could not adequately explain why DFS's response did not satisfy his concerns. Because appellant failed to demonstrate a legitimate basis for his belief that the search results would constitute exculpatory evidence, and the request was made months after

the jury convicted appellant, we find that the trial court did not abuse its discretion in denying the request.  See Bowman, 248 Va. at 135-36, 445 S.E.2d at 113.

## CONCLUSION

Having found no error in the trial court's judgment, we affirm appellant's convictions and sentence.

Affirmed.