COURT OF APPEALS OF VIRGINIA

UNPUBLISHED

Present:  Judges Fulton, Lorish and White
Argued at Norfolk, Virginia


CHARLES TOY ASHLEY, A/K/A
 SUN-RA SUBUWR ABDULLAH
                                                      MEMORANDUM OPINION* BY
v.        Record No. 1350-23-1               JUDGE KIMBERLEY SLAYTON WHITE
                                                      SEPTEMBER 17, 2024
COMMONWEALTH OF VIRGINIA


FROM THE CIRCUIT COURT OF THE CITY OF NEWPORT NEWS
Christopher R. Papile, Judge

Charles E. Haden for appellant.

David A. Stock, Senior Assistant Attorney General (Jason S.
Miyares, Attorney General, on brief), for appellee.


A jury convicted Charles Toy Ashley of second-degree murder.  On appeal, Ashley

argues that he was guilty only of voluntary manslaughter because he acted in the heat of passion.

He also contends that the trial court erred by granting the Commonwealth's motion *in limine* to

admit certain evidence.  We affirm.

BACKGROUND[1]

In October 2020, Laura Hughes lived in Newport News with her boyfriend, Daniel Page;

her son, Calvin Hughes; and Page's brother, "Mike."  Occasionally staying with them was Ashley,

---

* This opinion is not designated for publication.  *See* Code § 17.1-413(A).

[1] We recite the facts "in the 'light most favorable' to the Commonwealth, the prevailing
party in the trial court."  *Hammer v. Commonwealth*, 74 Va. App. 225, 231 (2022) (quoting
*Commonwealth v. Cady*, 300 Va. 325, 329 (2021)).  Doing so requires us to "discard the evidence
of the accused in conflict with that of the Commonwealth, and regard as true all the credible
evidence favorable to the Commonwealth and all fair inferences to be drawn therefrom."  *Cady*,
300 Va. at 329 (quoting *Commonwealth v. Perkins*, 295 Va. 323, 324 (2018)).

whom Laura and Page knew as "Skip." On Halloween morning, Page told Ashley that he would no longer be allowed to stay at the house. That evening, Ashley called Laura, but she did not answer because Page said "it would cause problems." Ashley then called Page, who answered and "made it very clear" that Ashley would not be permitted to visit.

Despite being told not to return to the house, Ashley returned later that night and encountered Laura in the hallway. Laura observed that Ashley's "demeanor was different" and that he was wearing a big, oversized coat. Again, Laura told him to leave and that she would "call [him] tomorrow."

After Ashley refused Laura's request to leave the house, Page stood, walked to Laura, and told Ashley to "get the fuck out of his house." Page, who was unarmed, did not yell or touch Ashley. Laura described Page telling Ashley to leave as "stern but loud." In response, Ashley told Page "don't put your hands on me" as Ashley reached into his right pocket, grabbed a knife, and "lunged towards" Page. Laura pulled Ashley away from Page and saw puddles of blood on the floor as Page asked, "are you stabbing me?" Laura screamed, and Page fled towards Mike's room pleading, "Brother help, help, brother," with Ashley in pursuit.

Laura located her phone and ran outside the home. Once outside, Laura got in her vehicle, locked the doors, and called 911. Moments later, she watched Ashley "[s]lowly" walk out of the house with a backpack, like he was "not scared" or "in a rush," describing it as acting as if nothing had happened. He struggled to put an unidentified object in the backpack. Sirens sounded in the distance, causing Ashley to mount a bicycle and quickly pedal away.

Police arrived, entered the house, and found Page "bleeding heavily" on the floor. He was very pale and unresponsive to the officers. Both police and paramedics described a "trail of blood" leading from the front entryway of the home to the back area where Page was found in a pool of

blood. While the officers made it clear they did not conduct a search of the home, they saw no weapons near Page nor in the house.

Paramedics transported Page and a police officer to the hospital via ambulance. The paramedics initially determined that Page had three stab wounds in his chest and two in his back. Page remained minimally responsive to direct questions and could not move on his own. The officer who was in the ambulance asked Page, "who did this to you?" Page replied with a "name" that the officers and paramedics believed sounded "something" like "Skip" or "Skiff." Page died shortly after despite emergency surgery at the hospital.[2]

Hours after the incident, Newport News Police Officer Jarod Goodnight and other officers were looking for "Skip," the "murder suspect." Officer Goodnight saw Ashley, who matched the suspect's description[3] as he was wearing a backpack and riding a bicycle through an intersection. After officers stopped Ashley, Officer M. Rusk opened his backpack and found a bloody knife, flashlight, and towel inside. Officer Rusk set the backpack and its contents a few feet to the side; it remained within Officer Goodnight's "line of sight" until it was given to Abigail Bratlien, a forensic specialist in the Newport News Forensic Services Unit. Around 7:00 a.m. the morning after the incident, Officer Rusk also gave Bratlien many of the items Ashley had been wearing, including an unmatching pair of shoes. Bratlien swabbed the flashlight, Ashley's shoes, and the knife and sent the samples to the Department of Forensic Science for testing. DFS returned a certificate of analysis of its testing that the trial court admitted as Commonwealth's Exhibit 8. Forensic analysis revealed that Page could not be eliminated as a contributor to the DNA found on the flashlight and shoes.

---

[2] The record is devoid of any evidence that Page expressed an expectation of whether or not he would recover from his wounds.

[3] The description given to police included a black male in a black coat with a fishnet facemask, wearing a backpack and riding a bicycle.

Dr. Wendy Gunther, who was qualified as an expert in forensic pathology, performed an autopsy on Page.[4]  Her examination revealed that Page had been stabbed between seven and nine times, including at least twice in the back.  Wounds on Page's forearms suggested "defensive wound injuries."  Another wound started in his left cheek and entered his sinus cavity, which could have caused Page to choke on his own blood.  A different wound in Page's chest severed his coronary artery and "reached his heart."  Dr. Gunther identified the chest wound as the cause of his death, explaining that the wound would have caused a heart attack as Page was "bleeding out."

Ashley was charged with second-degree murder.  Before trial, the Commonwealth moved *in limine* to admit (1) Page's dying declaration that "Skip" had stabbed him, and (2) Ashley's shoes and backpack.  At a pretrial hearing, the Commonwealth proffered that Page became completely unresponsive about 5 minutes after identifying "Skip" in the ambulance as the perpetrator, and he died after another 30 minutes.  The Commonwealth argued that it was a "black and white" dying declaration, given Page's injuries, blood loss, and minimal responsiveness.  Ashley responded that the statement was not an admissible dying declaration because there was no evidence that Page "perceived" that he was dying, especially given an earlier statement he made to the paramedics that he was "okay."  He also argued that Page's statement was not "clear" because it had to be interpreted by the officer and paramedics in the ambulance.  Finally, he asserted that too much time had elapsed between Page's statement and his death.  The trial court granted the Commonwealth's motion, ruling that Page's statement was admissible as a dying declaration because the circumstances amply demonstrated that Page was barely conscious, close to death, could not move on his own, and never expressed a belief that he would survive.  Thus, the court concluded that Page's "subjective state of mind" at the time of the statement "was that he was under a sense of impending death."

---

[4] The parties stipulated to a proper chain of custody of Page's body.

Next, regarding Ashley's backpack and shoes, the Commonwealth proffered that Officer Rusk transported Ashley to headquarters for an interview after his arrest. Video of the interview and booking process demonstrated that Ashley was still wearing his shoes. The Commonwealth acknowledged, however, that there was a 40-minute gap between when Officer Rusk placed the shoes in a brown bag and when he gave them to Bratlien. The Commonwealth stated that it did not intend to call Officer Rusk as a witness at trial because he had since been charged in another jurisdiction with "some pretty serious charges" and was no longer a Newport News police officer. Nevertheless, the Commonwealth argued that the 40-minute gap went to only the evidence's weight, not its admissibility. Ashley countered that because Officer Rusk was neither dead nor unavailable, the Commonwealth could secure his testimony through a "simple subpoena." The trial court granted the Commonwealth's motion, finding that the gap in the chain of custody did not render the shoes inadmissible.

At trial, Ashley moved to strike the evidence at the close of the Commonwealth's case-in-chief, arguing that he was guilty only of voluntary manslaughter because the "killing was done in the heat of the moment"; the trial court denied the motion. Ashley's counsel rested without presenting any evidence. After further argument by counsel, the jury convicted Ashley of second-degree murder. At the sentencing hearing on July 28, 2023, Ashley was sentenced to 40 years in prison, with 14 years suspended for a period of 20 years.

ANALYSIS

I. Motion to Strike Second-Degree Murder

Ashley argues that the evidence demonstrated that he acted in the heat of passion and, therefore, he lacked the requisite malice to sustain his second-degree murder conviction. He asserts that Page confronted and cursed at him in the hallway "in a way that . . . readily induce[d] sudden fear and anger." Thus, he contends that the "killing was done in the heat of the moment,"

on reasonable "provocation." Accordingly, he maintains that he should have been convicted only of voluntary manslaughter as a lesser-included offense.

"[I]n Virginia, criminal homicide is divided into two categories: murder and manslaughter. 'Murder' is the unlawful killing of another with malice. 'Manslaughter, on the other hand, is the unlawful killing of another without malice.'" *Dandridge v. Commonwealth*, 72 Va. App. 669, 681 (2021) (quoting *Canipe v. Commonwealth*, 25 Va. App. 629, 642 (1997)). Malice "includes not only anger, hatred and revenge, but every unlawful and [unjustified] motive." *Watson-Scott v. Commonwealth*, 298 Va. 251, 256 (2019) (alteration in original) (quoting *Martin v. Commonwealth*, 184 Va. 1009, 1015 (1946)). It "is intended to denote an action flowing from any wicked and corrupt motive, done with an evil mind and purpose and wrongful intention." *Id.* Malice may be expressed or implied. *Essex v. Commonwealth*, 228 Va. 273, 280 (1984) (citing *Coleman v. Commonwealth*, 184 Va. 197, 201 (1945)). "Express malice is evidenced when 'one person kills another with a sedate, deliberate mind, and formed design.'" *Watson-Scott*, 298 Va. at 256 (quoting *Pugh v. Commonwealth*, 223 Va. 663, 668 (1982)). Implied malice "exists when any *purposeful, cruel act* is committed by one individual against another without any, or without great provocation." *Essex*, 228 Va. at 280 (quoting *Pugh*, 223 Va. at 668). "[M]alice may be implied from the deliberate use of a deadly weapon." *Watson-Scott*, 298 Va. at 256 (quoting *Smith v. Commonwealth*, 239 Va. 243, 264 (1990)).

Second-degree murder does not require a willful, deliberate, and premeditated act; it is defined simply as a malicious killing. *Turner v. Commonwealth*, 23 Va. App. 270, 274 (1996). In Virginia, every unlawful homicide is presumed to be murder of the second degree. *Pugh*, 223 Va. at 667. There is no presumption of deliberation and premeditation arising from the mere fact of a homicide. *Bradshaw v. Commonwealth*, 174 Va. 391 (1939). Under Code § 18.2-32, second-degree murder is defined using the common law definition: "Murder is the unlawful

killing of any person with malice aforethought[] and malice is either express . . . [o]r malice is implied . . ." and "[m]alice aforethought is the grand criterion which distinguishes murder from other killings." *M'Whirt's Case*, 44 Va. (3 Gratt.) 594, 604-05 (1846). The malice element distinguishes second-degree murder from voluntary manslaughter under Virginia law. *M'Whirt's Case*, 44 Va. (3 Gratt.) at 605.

Not all homicides are acts of murder. "A killing done in the heat of passion and upon reasonable provocation will reduce a homicide from murder to voluntary manslaughter." *Rhodes v. Commonwealth*, 41 Va. App. 195, 200 (2003) (citing *Barrett v. Commonwealth*, 231 Va. 102, 105-06 (1986)). "Heat of passion refers to the *furor brevis* which renders a man deaf to the voice of reason." *Williams v. Commonwealth*, 64 Va. App. 240, 249 (2015) (quoting *Graham v. Commonwealth*, 31 Va. App. 662, 671 (2000)). "Malice and heat of passion are mutually exclusive; malice excludes passion, and passion presupposes the absence of malice." *Barrett*, 231 Va. at 106. Heat of passion "excludes malice when provocation reasonably produces fear [or anger] that causes one to act on impulse without conscious reflection." *Williams*, 64 Va. App. at 249 (quoting *Graham*, 31 Va. App. at 671). "Words alone," however, "are never sufficient" provocation to justify "heat of passion." *Rhodes*, 41 Va. App. at 201. Thus, we have held that a trial court need not instruct a jury on heat of passion when the evidence demonstrated only that the defendant and victim exchanged "harsh words" before the defendant slashed the victim's face. *Caudill v. Commonwealth*, 27 Va. App. 81, 84-85 (1998). Whether malice exists is a finding of fact, binding on this Court unless it is plainly wrong or without evidentiary support. *Bell v. Commonwealth*, 11 Va. App. 530, 533 (1991) (citing *Higginbotham v. Commonwealth*, 216 Va. 349, 352 (1975)).

"On review of the sufficiency of the evidence, 'the judgment of the trial court is presumed correct and will not be disturbed unless it is plainly wrong or without evidence to

support it.'" *Ingram v. Commonwealth*, 74 Va. App. 59, 76 (2021) (quoting *Smith v. Commonwealth*, 296 Va. 450, 460 (2018)). "The question on appeal, is whether 'any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.'" *Id.* (quoting *Yoder v. Commonwealth*, 298 Va. 180, 182 (2019)). "If there is evidentiary support for the conviction, 'the reviewing court is not permitted to substitute its own judgment, even if its opinion might differ from the conclusions reached by the finder of fact at the trial.'" *Chavez v. Commonwealth*, 69 Va. App. 149, 161 (2018) (quoting *Banks v. Commonwealth*, 67 Va. App. 273, 288 (2017)). "When considering the sufficiency of the evidence presented below, a reviewing court does not ask itself whether *it* believes that the evidence at the trial established guilt beyond a reasonable doubt." *Yerling v. Commonwealth*, 71 Va. App. 527, 532 (2020).

Here, Ashley was present in Page's home without permission, and after being told multiple times that he was no longer welcome there. Despite Ashley's strange demeanor that evening and the fact that he was an unwanted, uninvited visitor, Page did not threaten or touch Ashley in any way. Instead, he merely spoke harsh words, including telling Ashley to "get the fuck out of his house." In response to Page telling an unwanted visitor to leave his house, Ashley lunged at Page and stabbed him with a knife—a deadly weapon. *See Flanders v. Commonwealth*, 298 Va. 345, 358 (2020) (holding that "malice may be implied from use of a deadly weapon," such "as a gun or a knife"). Then, as Page fled and pleaded for his brother's help, Ashley pursued him and during the incident stabbed him a total of seven or eight times, including to the back, chest, cheek, and forearms. Ashley did not render or seek aid for Page but instead fled from the scene as police and paramedics drew near.

Nothing in the record demonstrates that Ashley was confronted with anything more than mere words, let alone circumstances that would "render a reasonable person deaf to the voice of reason." *See Rhodes*, 41 Va. App. at 201-02 (internal quotation marks and citation omitted)

(holding that the victim's verbal "threat[] to shoot" the defendant while pointing a finger in his direction failed to establish "reasonable provocation on the part of the victim"). Instead, the evidence overwhelmingly supports the conclusion that Ashley maliciously stabbed Page with a deadly weapon while being an unwanted visitor in Page's house. Accordingly, the trial court appropriately submitted the issue to the jury and there is no basis for overturning its verdict.

## II. Evidentiary Objections

Ashley contends that his backpack and shoes were not admissible because Officer Rusk was not unavailable and could have testified under a "simple subpoena." Despite stipulating at trial that there was a proper chain of custody, he now asserts that the absence of the officer was fatal to the chain and to the admission of the DNA certificate. Ashley also argues that the trial court erred by admitting Page's "dying declaration" because Page did not "perceive" that he was going to die.

"[W]e review a trial court's decision to admit or exclude evidence" for abuse of discretion. *Kenner v. Commonwealth*, 299 Va. 414, 423 (2021) (alteration in original) (quoting *Avent v. Commonwealth*, 279 Va. 175, 197 (2010)). "In evaluating whether a trial court abused its discretion, . . . 'we do not substitute our judgment for that of the trial court. Rather, we consider only whether the record fairly supports the trial court's action.'" *Carter v. Commonwealth*, 293 Va. 537, 543 (2017) (alteration in original) (quoting *Grattan v. Commonwealth*, 278 Va. 602, 620 (2009)). "The abuse-of-discretion standard [also] includes review to determine that the discretion was not guided by erroneous legal conclusions." *Id.* at 543-44 (alteration in original) (quoting *Porter v. Commonwealth*, 276 Va. 203, 260 (2008)). "Only when reasonable jurists could not differ can we say an abuse of discretion has occurred." *Lambert v. Commonwealth*, 70 Va. App. 740, 749 (2019) (quoting *Thomas v. Commonwealth*, 44 Va. App. 741, 753, *adopted upon reh'g en banc*, 45 Va. App. 811 (2005)).

A. Chain of Custody

"The purpose of the chain of custody rule is to establish that the evidence obtained by the police was the same evidence tested." *Jeter v. Commonwealth*, 44 Va. App. 733, 737 (2005) (quoting *Robertson v. Commonwealth*, 12 Va. App. 854, 857 (1991)). "Accordingly, to satisfy the chain of custody requirement, the proponent of the evidence must show 'with reasonable certainty that the item [has] not been altered, substituted, or contaminated prior to analysis, in any way that would affect the results of the analysis.'" *Id.* (alteration in original) (quoting *Crews v. Commonwealth*, 18 Va. App. 115, 119 (1994)). Nevertheless, "the Commonwealth is not required 'to exclude every conceivable possibility of substitution, alteration or tampering.'" *Id.* (quoting *Alvarez v. Commonwealth*, 24 Va. App. 768, 776 (1997)).

Rather, the evidence need only "afford reasonable assurance that the exhibits at trial are the same and in the same condition as they were when first obtained." *Pope v. Commonwealth*, 60 Va. App. 486, 511 (2012) (quoting *Pope v. Commonwealth*, 234 Va. 114, 121 (1987)). Thus, "gaps in the chain [of custody] normally go to the weight of the evidence rather than its admissibility." *Id.* (alteration in original) (quoting *Aguilar v. Commonwealth*, 280 Va. 322, 332-33 (2010)). Only when a "vital link in the chain of custody is not accounted for" is the evidence inadmissible. *Robinson v. Commonwealth*, 212 Va. 136, 138 (1971) (quoting *People v. Riser*, 305 P.2d 1, 10 (Cal. 1956)).

Here, Ashley contests the chain of custody of the backpack and the items within, as well as the shoes he was wearing at the time of his arrest. The evidence demonstrated that Officer Goodnight watched Officer Rusk open Ashley's backpack to discover the knife, flashlight, towel, and blood inside. Upon finding the items, Officer Rusk set the backpack aside, where it remained within Officer Goodnight's line of sight until it was delivered to Bratlien for forensic analysis. Thus, there was no gap in the chain of custody regarding the backpack and its contents

and certainly all vital links in the chain of possession are accounted for. The Commonwealth provided more than reasonable assurance that the items were in the same condition when tested as they were when they were found on Ashley's person.

On the issue of the shoes, Ashley is shown wearing the shoes on Rusk's body worn camera footage, a fact confirmed by other officers who were present at the time. Rusk's video showed another officer holding a paper bag into which sheriff's deputies placed Ashley's shoes. That officer gave Rusk the bag containing Ashley's shoes, and Rusk delivered the shoes to Bratlien about 40 minutes later. However, regarding the shoes, Ashley does not argue that Officer Rusk's transportation and delivery of the shoes to Bratlien was a "vital link" in the chain of custody. Rather, he contends only that Officer Rusk was not "unavailable" and could have testified as a witness. To be sure, Officer Rusk's testimony might have eliminated any doubt as to the chain of custody regarding Ashley's shoes. But Ashley's argument does not actually address the trial court's ruling—that even without Officer Rusk's testimony, there was no missing "vital link" that rendered the shoes and subsequent forensic analysis inadmissible. Thus, he has failed to demonstrate that the trial court abused its discretion by granting the Commonwealth's motion *in limine*. *See Palmer v. Atl. Coast Pipeline, LLC*, 293 Va. 573, 580 (2017) (refusing to consider an argument not raised in the opening brief).

Additionally, at trial Ashley agreed to certain stipulations, including the chain of custody regarding all of the aforementioned items. Among these stipulations was the following:

> 4) That there was at all times a proper chain of custody for any and all items of evidence, as identified, collected, and submitted by the Newport News Police Department to the Department of Forensic Science. These stipulated items include, but are not limited to the following:

The subparts to this paragraph include items of physical evidence that investigators had seized and submitted to DFS for testing. Mentioned there were the "[b]lack and red Hyper Tough

- 11 -

flashlight," the swab of red stain taken from that flashlight labeled as Item 200B-A, the "[r]ight grey, black, and blue AND1 shoe, size 12, that the defendant was wearing when he was arrested," the "[l]eft black AND1 shoe, size 13 that the defendant was wearing when he was arrested," and the swabs of suspected blood taken from those shoes labeled as Items 205A and 205B. Because of this stipulation order agreed to by Ashley, his arguments regarding the chain of custody have been waived. Therefore the trial court did not err in granting the motion *in limine*.

### B. Dying Declaration

"In a prosecution for homicide," the rule against hearsay does not exclude "a statement made by a declarant who believed when the statement was made that death was imminent and who had given up all hope of survival, concerning the cause or circumstances of declarant's impending death." Va. R. Evid. 2:804(b)(2). To qualify as a "dying declaration," the victim's statement must be made "under a sense of impending death" without any "expectation or hope of recovery." *Satterwhite v. Commonwealth*, 56 Va. App. 557, 562 (2010) (quoting *Clark v. Commonwealth*, 235 Va. 287, 291 (1988)). "But the victim need not verbalize his sense of impending death." *Id.* Rather, the victim's "consciousness [of impending death] may be established . . . by the character and nature of the wound, his appearance and conduct." *Id.* (quoting *Hill v. Commonwealth*, 43 Va. (2 Gratt.) 594, 608 (1845)).

For the purposes of this appeal, we assume, without deciding, that the trial court erred when it admitted Page's statement as a dying declaration. However, even in making that assumption, we conclude that any error made by the trial court was harmless because the challenged statement only went to the identity of the perpetrator, a fact that Ashley did not contest at trial.

It is well-established that this Court "will not reverse a trial court for evidentiary errors that were harmless to the ultimate result." *Carter*, 293 Va. at 544 (quoting *Shifflett v. Commonwealth*, 289 Va. 10, 12 (2015)). "Under the harmless error doctrine, if there was 'a fair trial on the merits and substantial justice has been reached, no judgment shall be arrested or reversed . . . for any . . . defect, imperfection, or omission in the record, or for any error committed on the trial.'" *Shifflett*, 289 Va. at 12 (alterations in original) (quoting Code § 8.01-678). "[W]e apply the standard for non-constitutional harmless error, which is that such error is harmless if we can be sure that it did not influence the jury or had only a slight effect." *Carter*, 293 Va. at 545 (alteration in original) (quoting *Shifflett*, 289 Va. at 12). "An error does not affect a verdict if a reviewing court can conclude, without usurping the jury's fact-finding function, that, had the error not occurred, the verdict would have been the same." *Campos v. Commonwealth*, 67 Va. App. 690, 717 (2017) (quoting *Lavinder v. Commonwealth*, 12 Va. App. 1003, 1006 (1991) (en banc)). In conducting a harmless error analysis, courts "typically" consider: "(1) the importance of the tainted evidence in the prosecutor's case, (2) whether that evidence was cumulative, (3) whether there is evidence that corroborates or contradicts the tainted evidence on material points, and (4) the strength of the prosecution's case as a whole." *Commonwealth v. White*, 293 Va. 411, 421 n.5 (2017) (quoting *Angel v. Commonwealth*, 281 Va. 248, 264 (2011)). Thus, where "the record contains 'overwhelming' evidence of guilt," erroneously admitted evidence is harmless. *See Scott v. Commonwealth*, 25 Va. App. 36, 42 (1997) (quoting *Clagett v. Commonwealth*, 255 Va. 79, 91 (1996)).

Here, Page's entire statement dealt with the identity of the person who stabbed him. Page was directly asked by the officer who was in the ambulance, "who did this to you?" Page replied with a "name" that the officers and paramedics believed sounded "something" like "Skip" or "Skiff." During trial, Ashley moved to strike the Commonwealth's evidence because the killing

- 13 -

was voluntary manslaughter, not second-degree murder. Additionally, in his opening brief before this Court, Ashley once again does not argue that he did not kill Page, only that it was done in the heat of passion under provocation. What is more, there was ample other evidence identifying Page as the perpetrator, such as Laura's eyewitness account of the stabbing.

Because it is clear and admitted to that Ashley was the perpetrator, any evidence improperly let into the record regarding the identity of the perpetrator is cumulative and therefore harmless. Once again, we assume, without deciding, that it was error to admit Page's statement as a dying declaration. However, any error made by the trial court in admitting the dying declaration is deemed harmless. Therefore, we affirm the trial court on this issue.

CONCLUSION

In this case there is sufficient and even overwhelming evidence that Ashley murdered Page, not in the heat of passion nor due to provocation. Regarding the evidentiary issues, there was sufficient evidence to show that all vital links were accounted for, the issue was waived, or it was harmless error. For these reasons, we affirm the trial court's judgment.

*Affirmed.*