COURT OF APPEALS OF VIRGINIA

UNPUBLISHED

Present:    Judges AtLee, Chaney and Frucci
Argued by videoconference


STEVEN EDWARD THODOS
                                                MEMORANDUM OPINION* BY
v.        Record No. 1041-23-4                  JUDGE RICHARD Y. ATLEE, JR.
                                                        JUNE 10, 2025
COMMONWEALTH OF VIRGINIA


FROM THE CIRCUIT COURT OF LOUDOUN COUNTY
Stephen E. Sincavage, Judge

Samantha Offutt Thames, Senior Appellate Counsel (Virginia
Indigent Defense Commission, on briefs), for appellant.

Lindsay M. Brooker, Assistant Attorney General (Jason S. Miyares,
Attorney General, on brief), for appellee.


Following a jury trial, the trial court convicted Steven Edward Thodos of two counts of

attempted capital murder of a law enforcement officer, aggravated malicious wounding, three

counts of use of a firearm in the commission of a felony, and grand larceny of a vehicle.[1]  Thodos

raises multiple issues on appeal.  He argues that the trial court erred by admitting certain exhibits

into evidence and by refusing to give his proffered jury instruction.  He further argues that the

evidence was insufficient to support his various convictions.  For the following reasons, we disagree

and affirm the trial court.

_____

* This opinion is not designated for publication.  *See* Code § 17.1-413(A).

[1] There was also a felon in possession of a firearm charge, which the trial court severed
from the other charges, that is not at issue in this appeal.

I. BACKGROUND

"On appeal, we state the facts in the light most favorable to the Commonwealth," the prevailing party below. *Newsome v. Commonwealth*, 81 Va. App. 43, 48 (2024).

A. *The Events at Walmart*

In January 2021, Muhammed Amin was working as an asset protection associate at Walmart in Loudoun County when he observed Thodos in the health and beauty accessories aisle. Amin had seen Thodos two or three days earlier with "the same merchandise in his cart." Amin started following Thodos through the store, and he also asked his coworker in the asset protection office to point security cameras at Thodos. Amin observed Thodos go to the self-checkout, where he watched Thodos scan and pay for some items, while placing other items in the bag without scanning or paying for them.

Amin approached Thodos and introduced himself as a loss prevention associate. He asked Thodos to come to the loss prevention office because he had seen that Thodos did not scan some items. Thodos went with Amin, and Amin directed him to sit on a stool. There were four other people in the loss prevention office, Amin's colleagues, Jade Pusloskie and Gurine Costa, and two customers. Once in the office, Amin separated out the items that Thodos had paid for and those he had not. Pusloskie called the police for Amin.

Within 10 to 15 minutes, Deputy Camron Gentry from the Loudoun County Sheriff's Office arrived. Deputy Gentry obtained Thodos's information and relayed it to dispatch. He then asked Thodos to stand up, and Thodos complained trying to sit down, and saying "there's no reason to be standing." Though the interaction started off calmly, it "slowly got more tense." Deputy Gentry tried to pat Thodos down, but Thodos resisted, using physical force to get away from Gentry. Deputy Gentry decided to wait for backup because he wanted to prevent a "physical altercation" on his own with Thodos.

Soon after, Deputy Charles Ewing arrived. The two deputies tried to put handcuffs on Thodos, who was "fighting back" and "actively resisting." During the struggle, Amin asked the other people in the office to move towards the door and get out of the way. They were doing so when they heard gunshots. Amin opened the door and fled to the parking lot. Before Pusloskie ran out, she saw Thodos "shoot[] at the floor" before raising the gun up, and she "watched as Gentry was shot, maybe one or two times" before she ran out of the room. As she left, she could hear shots fired "continuously," and she estimated she heard "five or ten" shots in addition to the ones before she left the room.[2]

Both Deputy Gentry and Deputy Ewing fell backward, with Gentry falling to the floor and Ewing falling to one knee. After catching his balance, Ewing reached for his gun and turned to face Thodos, who was standing approximately five feet away, aiming his weapon at the deputies and firing. Deputy Ewing fired two shots at Thodos in rapid succession, then stood up and took a third shot as he followed Thodos to the door.

Amin, who was in the parking lot, saw Thodos running towards the garden center and around the back of the building. Amin then went back to the loss prevention office, where he saw Deputy Gentry in serious pain, covered in blood, on the floor.

Deputy Ewing initially pursued Thodos, but he turned back when he realized that Deputy Gentry was not behind him. He returned to the loss prevention office and found Gentry "sitting down with his back against the wall, almost kind of curled up holding himself." Ewing laid Gentry down flat and begin to assess his injuries. He placed a tourniquet on Gentry's right leg above a "small hole with a massive amount of blood coming out of it." After placing the first tourniquet, he checked the rest of Gentry's body for injuries. Ewing saw blood pooling around Gentry's waist and

---

[2] Both Amin and Pusloskie suffered injuries. Amin had a wound in his leg and back, while Pusloskie had two "fragment pieces" enter her leg.

leg, and he decided to place a second tourniquet on Gentry's other leg. Eventually, Gentry was transported to the hospital.

B. *The Escape Attempt*

Approximately a quarter of a mile from Walmart, Ronald Simoneau was at his job at Carter Machinery. He had been in the building for about 20 minutes when he heard a "racket" outside the building. When he looked out to see what was going on, he saw his truck, a maroon F-150 Lariat SuperCab with two blue barrels in the back, "going down the driveway." He tried to chase the truck, but he was unable to catch it.

Fairfax Police Officer Brandon Edwards was on patrol when he received notice to look out for a stolen maroon F-150 that could be coming into Fairfax County in the area of "Route 28 at the 50 interchange." Officer Edwards spotted the truck, and he started following it. When he pulled in behind the truck and radioed in his location, "the vehicle took off." He was able to observe Thodos, whom he later identified in court. When the officer tried to initiate a traffic stop, Thodos "accelerated at a high rate of speed" and "immediately exited" from Route 28. Edwards pursued Thodos, who drove at "a high rate of speed well in excess of 100 miles an hour," as he ran through traffic signals and medians, and eventually lost control and crashed into a tree. Thodos exited the vehicle and fled on foot.

C. *The Fanny Pack, Holster, and Cartridges*

In Fairfax, Detective Julia Elliott documented the scene where Thodos crashed the truck. She took photos, made diagrams, and collected evidence. After that, she went to a second location nearby. There, she collected a red fanny pack, a holster, and cartridges. Inside the fanny pack, Elliott located a wallet containing a Tennessee photo identification card with Thodos's picture.

At trial, Elliott testified that she was the first detective on scene, though not the first officer, and she described her evidence collection process. She testified that she collected the fanny pack,

holster, and cartridges, secured them in a locker in the crime scene section, and ultimately turned them over to the Loudoun County Sheriff's Office. The Commonwealth moved to admit the three exhibits, and defense counsel asked to voir dire Elliott. During questioning, Elliott acknowledged that some of the items had been placed "into evidence bags by a patrol officer prior to [her] arrival." She did not know who that officer was.

Thodos objected to the admission of all three items, arguing, among other things, that the Commonwealth had not established a chain of custody. He argued that Detective Elliott was not the first on the scene, she did not know how many officers were there before her, and she did not know who had touched or bagged some of the evidence. He argued that the initial collection was a vital link in the chain of custody. The Commonwealth argued that the chain of custody does not have to be complete, only reasonably reliable such that the items are what they are purported to be. It pointed out that Detective Elliott had not stated which items were placed in bags by other officers. The trial court overruled the objections and admitted the items into evidence.

D. *The Buccal Swab and Certificate of Analysis*

Detective Michael Grimsley of the Loudoun County Sheriff's Office obtained a warrant to collect a DNA sample from and photos of Thodos. He executed the warrant at Fairfax Hospital. Grimsley testified that he put on gloves, opened the sealed buccal swab kit, and used the enclosed Q-tips to collect a saliva sample from Thodos. After using the kit to get the samples, he testified that he placed the Q-tips in a box, sealed the box, put the box inside an envelope, and sealed the envelope. He testified that he kept it in his control and possession until he arrived back at the sheriff's office, where he turned it over to Master Deputy Matt Devaney of the Loudoun County Sheriff's Office Crime Scene Unit.

Master Deputy Devaney testified that he was present with Detective Grimsley at the hospital when the sample was taken from Thodos. Devaney, however, claimed that he placed the saliva

samples into the bag and sealed them. He testified that he maintained the sealed package in his sole care and custody until he placed it in the property unit.

The Commonwealth sought to admit the buccal swab, and Thodos objected. Thodos noted that both Devaney and Grimsley claimed to have put the swabs in the envelope and sealed it. He also pointed out that there was no evidence about what happened to it after it was put into the property unit. The trial court sustained the objection, finding that there was still a gap in the chain of custody.

The Commonwealth then questioned Devaney further. He testified that he sealed the item. He stated that he knew he sealed the item because he "put an evidence sticker on it, [and] seal tape." He also explained the process of placing it in the property unit, which involved creating and attaching an evidence label to the bag. From there, the item is put into the evidence section, which is "a secure section."

The Commonwealth then presented testimony from James Lockhart, a property/quartermaster technician with the Loudoun County Sheriff's Office, that took custody of the buccal sample from the secure evidence locker and transported it to the lab where it was received by Amanda Matthews, the evidence receiving technician. Kim Dodd, a forensic scientist with the Department of Forensic Science ("DFS"), testified that she obtained the sealed buccal swab and conducted the analysis. When she was finished, she re-sealed the item and signed the seal. Lockhart testified that he also retrieved the sealed sample from the lab.

The Commonwealth then asked the court to admit the exhibit into evidence. Thodos sought to voir dire Dodd, who provided more detail on how the buccal swab was stored and handled while at DFS, including that Gabriella Kelly, a laboratory specialist, had moved the sealed sample from the main evidence receiving area to the section-wide vault, from which Dodd retrieved the sample to test it.

Thodos again objected to the admission of the buccal swab, arguing that there were still two breaks in the chain of custody due to the lack of testimony from Matthews and Kelly. The trial court overruled the objection. It found "that the evidence that's been adduced is with reasonable certainty that the item is what was collected originally, and it hasn't been altered, substituted, or contaminated."

Dodd then testified that her analysis of the buccal swab and the firearm determined that Thodos could not be eliminated as the contributor of the DNA profile developed from the firearm. She explained that she created a certificate of analysis, which the Commonwealth asked the court to admit into evidence. Thodos objected, asking the court to redact Thodos's name from the certificate. The trial court overruled the objection.

E. *The Surveillance Videos*

At trial, Amin testified about the incident in Walmart. He also described the store's camera system, explaining it had more than 200 cameras, two of which are in the loss prevention office. Amin testified that the cameras were working on the day of the shooting. He explained that the cameras record onto a DVR, which is in the loss prevention office. After a certain amount of time, the data is transferred to headquarters, where it is uploaded to a "cloud system," and it is deleted from the local system. The surveillance system is password protected, and the videos cannot be altered, changed, or deleted. He clarified that he had a password that allows access to the camera system to view videos, but his password did not allow him to upload or alter anything.

Amin testified that he reviewed the footage on the day of the shooting and again a week before the trial, and he confirmed that the video was the same. He denied that the video was altered or changed in any way. The trial court admitted the video over Thodos's objection to lack of foundation.

Courtney Sullivan, an asset protection assistant manager at Walmart, also testified about the camera system. She testified that the system was working on the day of the shooting and that access to the DVR, on which the video recorded, required a username and password provided by the Walmart "home office." She also testified that the recordings could not be deleted or altered on the system in the store. On the day of the shooting, she provided her password to Kristin Kennard, a digital forensic analyst for the Loudoun County Sheriff's Office, and she showed her how to use the system.

Kennard then testified that she reviewed the footage from the time frame provided her, and she burned it onto two DVDs, which she then checked into the police property unit. The trial court admitted into evidence, without objection from Thodos, a disc that contained all the video clips from the Walmart surveillance system.

F. *The Jury Instructions*

When the parties submitted their proposed jury instructions to the trial court, Thodos requested Jury Instruction D, which read:

> You may, but are not required, to infer based on all the facts and circumstances that Steven Thodos discharging a firearm at either Camron Gentry or Charles Ewing was done with the intent to scare the individuals and allow Steven Thodos to escape. Such an intent would tend to negate an intent to kill.

The Commonwealth objected, arguing that the jury instruction was not supported by more than a scintilla of evidence. It also noted that the *Martin v. Commonwealth*, 13 Va. App. 524 (1992) (en banc), case, on which Thodos relied, only required a lesser-included offense instruction. It argued that the proposed instruction was not a proper instruction and that it created a defense where there was no evidence for it.

The trial court refused the instruction. It found that the instruction was not "even a holding in the case" that was cited. The trial court was "not really convinced that it's a statement of law

- 8 -

more than it's just a rationale for the ruling given in [the] case, as well as [it thought] there's language in [the case] that is argumentative."

After it was instructed, the jury found Thodos guilty of two counts of attempted capital murder of a law enforcement officer, aggravated malicious wounding, three counts of use of a firearm in the commission of a felony, and grand larceny of a motor vehicle. Thodos now appeals.

II. ANALYSIS

A. *Admissibility of Evidence*

"The admissibility of evidence is within the broad discretion of the trial court, and a ruling will not be disturbed on appeal in the absence of an abuse of discretion." *Cheripka v. Commonwealth*, 78 Va. App. 480, 494 (2023) (quoting *Warnick v. Commonwealth*, 72 Va. App. 251, 263 (2020)). "Under that standard, a 'trial judge's ruling will not be reversed simply because an appellate court disagrees.'" *Id.* (quoting *Hicks v. Commonwealth*, 71 Va. App. 255, 275 (2019)). "Rather, a reviewing court can conclude that 'an abuse of discretion has occurred' only in cases in which 'reasonable jurists could not differ' about the correct result." *Id.* at 495 (quoting *Commonwealth v. Swann*, 290 Va. 194, 197 (2015)). This standard also includes a review to make sure the decision was "not influenced by any mistake of law." *Jones v. Commonwealth*, 71 Va. App. 70, 86 (2019) (quoting *Lawlor v. Commonwealth*, 285 Va. 187, 212-13 (2013)). Thodos challenges various evidentiary rulings made by the trial court. We address each argument in turn.

1. Walmart Security Camera Videos

Thodos argues that the trial court erred by admitting into evidence the Walmart security camera videos because the Commonwealth did not establish a proper foundation.

"The requirement of authentication or identification as a condition precedent to admissibility is satisfied by evidence sufficient to support a finding that the thing in question is what its proponent

claims." Va. R. Evid. 2:901. "[A]uthentication does not set a high barrier to admissibility, and is generally satisfied by any form of proof that supports a finding that it is what it purports to be." *Atkins v. Commonwealth*, 68 Va. App. 1, 9 (2017) (alteration in original) (quoting Charles E. Friend & Kent Sinclair, *The Law of Evidence in Virginia* § 17-1, at 1164 (7th ed. 2012)). "The measure of the burden of proof with respect to factual questions underlying the admissibility of evidence is proof by a preponderance of the evidence." *Id.* (quoting *Bloom v. Commonwealth*, 262 Va. 814, 821 (2001)).

"Photographs and videos are 'generally admitted into evidence for two purposes: to illustrate a witness' testimony, and as an 'independent silent witness' of matters revealed by the photograph [or video]." *Baez v. Commonwealth*, ___Va. ___, ___ (Dec. 19, 2024) (alteration in original) (quoting *Bailey v. Commonwealth*, 259 Va. 723, 738 (2000)). "This test for admission is an either/or test." *Bennett v. Commonwealth*, 69 Va. App. 475, 487 (2018).

"A photograph [or video] which is verified by the testimony of a witness as fairly representing what that witness has observed is admissible in evidence and . . . it need not be proved by the [individual] who made it." *Baez*, ___ Va. at ___ (alterations in original) (quoting *Tirado v. Commonwealth*, 296 Va. 15, 26-27 (2018)). "As a silent witness, or a witness that 'speaks for itself,' video or photograph evidence is admissible when '[g]iven an adequate foundation assuring the accuracy of the process producing it.'" *Id.* (alteration in original) (quoting *Ferguson v. Commonwealth*, 212 Va. 745, 746 (1972)).

Although Amin was not the creator of the videos, his testimony about the system established "an adequate foundation assuring the accuracy of the process producing it." *Id.* (quoting *Ferguson*, 212 Va. at 746). He testified that Walmart had a security camera system, it was working that day, and the videos recorded to a DVR, which was password protected. He testified that he was unable to alter, delete, or burn the videos, even with the password that he had. Further, Amin testified that

he watched the security system videos in Walmart after the incident and at trial, and he asserted that the videos were the same and had not been materially changed or altered. This testimony is similar to other cases in which this Court concluded that video evidence was admissible. *See, e.g.*, *Vazquez v. Commonwealth*, No. 0356-22-3 (Va. Ct. App. Feb. 14, 2023) (special agent testified that extraction program did not alter videos on phone, video was taken the same day as the seizure, and video was unaltered); *Penn v. Commonwealth*, No. 0529-21-3 (Va. Ct. App. Mar. 8, 2022) (testimony that video is tamper proof and sections cannot be added or deleted from the video).[3]

The asset protection manager also testified that the videos could not be edited or deleted. *See Ricks v. Commonwealth*, 39 Va. App. 330, 336 n.3 (2002) ("[W]e consider the entire record on appeal, not just the evidence before the court at the time of the ruling."). She also testified that she gave her credentials to the detectives, walked the forensic investigator through how to use the system, and she helped them burn the footage on to a DVD. Viewing this evidence, we find that the Commonwealth laid a sufficient foundation for admission of the Walmart surveillance videos under the silent witness theory.

### 2. Buccal Swab and Certificate of Analysis

Thodos argues that the trial court erred by admitting into evidence his buccal swab and the corresponding certificate of analysis. He argues that the Commonwealth did not establish a sufficient chain of custody because two officers testified that they sealed and maintained custody over the DNA swab.

"Where evidence is seized and analyzed, '[t]he purpose of the chain of custody rule is to establish that the evidence obtained by the police was the same evidence tested.'" *Hargrove v. Commonwealth*, 53 Va. App. 545, 553 (2009) (alteration in original) (quoting *Brown v.*

---

[3] "Unpublished opinions of this Court, while having no precedential value, are nevertheless persuasive authority." *Otey v. Commonwealth*, 71 Va. App. 792, 799 n.3 (2020) (quoting *Samartino v. Fairfax Cnty. Fire and Rescue*, 64 Va. App. 499, 508 n.2 (2015)).

*Commonwealth*, 21 Va. App. 552, 555 (1996)).  While the Commonwealth "is required to demonstrate evidence supporting every 'vital link in the chain of custody,'" it is not required to eliminate "all possibility of tampering."  *Pope v. Commonwealth*, 60 Va. App. 486, 511 (2012) (quoting *Robinson v. Commonwealth*, 212 Va. 136, 138 (1971)).  "[A] chain of custody is properly established when the Commonwealth's evidence affords reasonable assurance that the exhibits at trial are the same and in the same condition as they were when first obtained."  *Hargrove*, 53 Va. App. at 553 (alteration in original) (quoting *Anderson v. Commonwealth*, 274 Va. 469, 479 (2007)).  When there is a gap in the chain of custody, it "normally go[es] to the weight of the evidence rather than its admissibility."  *Pope*, 60 Va. App. at 511 (quoting *Aquilar v. Commonwealth*, 280 Va. 322, 332-33 (2010)).

The evidence establishes that Detective Grimsley personally collected the swab, it remained in police custody until Master Deputy Devaney secured it in an evidence locker, it was transported to DFS, and it was still sealed when Dodd retrieved the sample to conduct the analysis.  Both Grimsley and Devaney were present at the hospital when Grimsley took the sample.  The sample was collected and remained in the control and custody of law enforcement.  While both Grimsley and Devaney claimed to have sealed the swab and transported it to the Sheriff's office, this inconsistency goes to weight rather than admissibility.  We find that the evidence here sufficiently established the vital links in the chain of custody and showed with reasonable certainty that the buccal swab was not altered, substituted, or contaminated.  Accordingly, the trial court did not abuse its discretion in admitting the buccal swab and corresponding certificate of analysis.

### 3. Admissibility of the Fanny Pack, Holster, and Cartridge

Like his argument above, Thodos argues that the trial court erred by admitting into evidence the fanny pack, holster, and ammunition cartridge.  He contends that the Commonwealth did not

establish the initial link in the chain of custody because the detective that collected the evidence admitted that patrol officers put some of the items into evidence bags before her arrival.

His argument relies on *Robinson v. Commonwealth*, 212 Va. 136 (1971). In *Robinson*, the Court found that the Commonwealth failed to establish a vital link in the chain of custody of certain exhibits. 212 Va. at 138. In that case, an officer testified that he obtained the items from a nurse at the hospital. *Id.* at 137. Although the victim identified the items as hers, there was no testimony from the nurse that collected and then delivered the items to the officer. *Id.* Thus, the Court found that the Commonwealth did not establish "what was done with these exhibits from the time they were taken from the victim to the time they were delivered to" the officer. *Id.* Because of this, "[i]t [was] not reasonably certain from the testimony presented that these exhibits were in the same condition when analyzed as they were when taken from the victim." *Id.* at 138.

But the Court added that the exhibits were "admitted to supply a basis for the opinion testimony" of certain witnesses that analyzed the exhibits. *Id.* at 139. If the exhibits, which included the victim's clothing, had been admitted only as demonstrative exhibits to establish what the victim was wearing when she was attacked, rather than as the basis for opinion testimony, then the victim's identification of these exhibits would have been sufficient to admit them. *Id.* at 138-39.

This case, unlike *Robinson*, did not involve scientific testing of the exhibits at issue. The fanny pack, holster, and cartridges were not admitted as the basis for any opinion testimony regarding any scientific testing. Instead, these exhibits were admitted as corroborative evidence tying Thodos to the offenses. For example, other evidence, including security camera videos, body-worn camera videos, and still shots, all showed Thodos wearing a red fanny pack across his chest. The use of these exhibits is more like if the Commonwealth had used the exhibits in *Robinson* simply to establish what the victim was wearing when she was attacked.

- 13 -

Detective Elliott's testimony that she collected these items from the scene and that the items shown in court were the items she collected, in conjunction with other evidence tying the car crash to Thodos fleeing the shooting, is sufficient to establish the chain of custody for the exhibits. From this, the Commonwealth had established "with reasonable certainty that there has been no alteration or substitution" of the exhibits. *Id.* at 138; *see also Hargrove*, 53 Va. App. at 553 ("[C]hain of custody is properly established when the Commonwealth's evidence affords reasonable assurance that the exhibits at trial are the same and in the same condition as they were when first obtained." (quoting *Anderson*, 274 Va. at 479)). Thus, we find that the trial court did not abuse its discretion in admitting the fanny pack, holster, and cartridge.

B. *Jury Instruction D*

"A reviewing court's responsibility in reviewing jury instructions is 'to see that the law has been clearly stated and that the instructions cover all issues which the evidence fairly raises.'" *Conley v. Commonwealth*, 74 Va. App. 658, 674-75 (2022) (quoting *Fahringer v. Commonwealth*, 70 Va. App. 208, 211 (2019)). "We review a trial court's decisions in giving and denying requested jury instructions for abuse of discretion." *Id.* at 675. "[W]hether a jury instruction accurately states the relevant law is a question of law that we review de novo." *Id.* (alteration in original) (quoting *Watson v. Commonwealth*, 298 Va. 197, 207 (2019)). During our review, we "view[] the facts in the light most favorable to the instruction's proponent." *Howsare v. Commonwealth*, 293 Va. 439, 443 (2017).

"A charge of attempted capital murder requires proof of . . . 'a specific intent to kill the victim.'" *Jordan v. Commonwealth*, 50 Va. App. 322, 327 (2007) (alteration in original) (quoting *Martin*, 13 Va. App. at 527).

Thodos argues that the trial court erred by refusing Jury Instruction D, which instructed the jury that it could infer from the facts and circumstances that Thodos discharged his firearm

"with the intent to scare the individuals and allow [him] to escape" and that "[s]uch an intent would tend to negate an intent to kill." He contends that he presented more than a scintilla of evidence that a jury could have believed he intended only to scare the deputies. He relies on *Martin*, to support his argument.

In *Martin*, the defendant was charged with attempted capital murder. 13 Va. App. at 525. He sought an instruction that told the jury that assault was a lesser-included offense of attempted capital murder, but the trial court refused the instruction. *Id.* at 526-27. The evidence established that the defendant was fleeing from a police officer, and while he did lunge at the officer with a knife when trying to escape, he immediately thereafter disengaged from the confrontation and ran away. *Id.* at 526. The Court found that while the jury could infer an intent to kill, the evidence, in particular that he "disengaged from the confrontation and resumed his flight," also permitted an inference that the defendant "intended only to scare the officer into discontinuing the chase." *Id.* at 527-28. Thus, the evidence supported the lesser-included offense of assault, and the jury should have been so instructed. *Id.* at 529.

This case is different, however. Thodos's proposed instruction varied significantly from the proposed instruction in *Martin*. Thodos did not ask for an instruction on the lesser-included offense of assault. Instead, he asked for an instruction that an intent to scare negated an intent to kill, which was not the issue decided in *Martin*. The Court's explanation that the evidence in *Martin* supported an inference of an intent to scare was a rationale for requiring the instruction on the lesser-included offense rather than a separate approval of a principle of a law. The jury was properly instructed that to convict Thodos of attempted capital murder, the Commonwealth had to prove beyond a reasonable doubt that Thodos had the intent to kill the deputies. Any argument that the intent to kill did not exist because Thodos intended only to scare the deputies was simply that—an argument. We find that Thodos's proposed instruction was distinct from

- 15 -

the instruction in *Martin*, and it was not an accurate statement of the law. Accordingly, the trial court did not err in refusing the instruction.

### C. *Sufficiency of the Evidence*

When considering a challenge to the sufficiency of the evidence, "the appellate court views the evidence in the 'light most favorable' to the Commonwealth, the party who prevailed in the trial court." *Bagley v. Commonwealth*, 73 Va. App. 1, 26 (2021). "This Court must 'discard the evidence of the accused in conflict with that of the Commonwealth, and regard as true all the credible evidence favorable to the Commonwealth and all fair inferences to be drawn [from that evidence].'" *Id.* (alteration in original) (quoting *Cooper v. Commonwealth*, 54 Va. App. 558, 562 (2009)). A "reviewing court 'does not "ask itself whether *it* believes that the evidence at the trial established guilt beyond a reasonable doubt."'" *Id.* (quoting *Davis v. Commonwealth*, 65 Va. App. 485, 500 (2015)). "In the end, the appellate court asks only 'whether any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.'" *Park v. Commonwealth*, 74 Va. App. 635, 653 (2022) (quoting *Commonwealth v. Cady*, 300 Va. 325, 329 (2021)).

### 1. Attempted Capital Murder—The Specific Intent to Kill[4]

Thodos argues that the trial court erred by convicting him of attempted capital murder because the evidence was insufficient to prove that he intended to kill Deputies Gentry and Ewing.

Code § 18.2-31(A)(6) prohibits the "willful, deliberate, and premeditated killing of a law-enforcement officer . . . when such killing is for the purpose of interfering with the performance of his official duties." "A charge of attempted capital murder requires proof of . . . 'a specific

---

[4] Thodos also challenges his convictions for the use of a firearm in the commission of a felony. He argues that because the evidence was insufficient to support the underlying felonies (attempted capital murder and aggravated malicious wounding), the use of a firearm offenses must also fail. Because we find the evidence sufficient to support the underlying convictions, we likewise affirm the convictions for the use of a firearm.

intent to kill the victim.'" *Jordan*, 50 Va. App. at 327 (alteration in original) (quoting *Martin*, 13 Va. App. at 527). "A person cannot be guilty of an attempt to commit murder unless he has a specific intent to kill." *Stevens v. Commonwealth*, 38 Va. App. 528, 534 (2002) (quoting *Haywood v. Commonwealth*, 20 Va. App. 562, 565 (1995)).

"Whether the required intent exists is generally a question for the trier of fact." *Id.* at 535 (quoting *Nobles v. Commonwealth*, 218 Va. 548, 551 (1977)). "Intent is the purpose formed in a person's mind, which may be shown by circumstantial evidence including the person's conduct." *Coles v. Commonwealth*, 270 Va. 585, 590 (2005). "Specific intent may be shown by circumstances, including by a person's conduct or by his statements. The inferences to be drawn from proven facts, so long as they are reasonable, are within the province of the trier of fact." *Hancock v. Commonwealth*, 12 Va. App. 774, 782 (1991) (internal citations omitted). "[T]he use of a deadly weapon, standing alone, is not sufficient to prove the *specific intent* required to establish attempted murder," *Goodson v. Commonwealth*, 22 Va. App. 61, 78 (1996) (quoting *Hargrave v. Commonwealth*, 214 Va. 436, 437 (1974)), but it is a factor to consider.

The evidence here was sufficient to demonstrate that Thodos had the specific intent to kill the deputies. Thodos acted aggressively towards the officers and refused to let them pat him down and handcuff him. Though neither officer had their weapons drawn, Thodos pulled out a gun and fired at the officers. Thodos argues that the only evidence of the trajectory of the initial shots is that the gun was pointed down, which indicates an intent to scare rather than kill. We find this unpersuasive for two reasons. First, the initial shots occurred while officers were attempting to detain Thodos, and the surveillance videos show the officers grappling with Thodos, meaning they were very close together. Even a downward shot was likely to hit one of the officers. Second, even after both officers fell backwards, Thodos raised his arm and continued shooting. Rather than disengage and flee, Thodos continued firing after he hit one of

- 17 -

the officers. *See Martin*, 13 Va. App. at 526-27 (finding evidence supported an inference that the defendant intended only to scare an officer where he lunged with a knife while trying to escape, immediately disengaged when the officer fell backwards, and then resumed his flight). Thodos fired at least six shots, and he hit Deputy Gentry multiple times. Accordingly, we find that the evidence was sufficient to demonstrate that Thodos possessed the specific intent to kill the deputies.

### 2. Aggravated Malicious Wounding

Thodos next argues that the evidence was insufficient to support his conviction for the aggravated malicious wounding of Deputy Gentry. We disagree.

"If any person maliciously shoots, stabs, cuts or wounds any other person, or by any means causes bodily injury, with the intent to maim, disfigure, disable or kill," he is guilty of aggravated malicious wounding "if the victim is thereby severely injured and is caused to suffer permanent and significant physical impairment." Code § 18.2-51.2(A).

Thodos first argues that there was no evidence that he intended to maim, disfigure, disable or kill Deputy Gentry. As discussed above, "[i]ntent is the purpose formed in a person's mind at the time an act is committed." *Johnson v. Commonwealth*, 53 Va. App. 79, 100 (2008) (quoting *Commonwealth v. Taylor*, 256 Va. 514, 519 (1998)). It "may, and often must, be inferred from the facts and circumstances of the case, including the actions and statements of the accused." *Id.* (quoting *Taylor*, 256 Va. at 519). The "nature and extent of the bodily injur[ies] and the means by which [they were] accomplished" may be considered in determining intent. *Luck v. Commonwealth*, 32 Va. App. 827, 832 (2000) (quoting *Campbell v. Commonwealth*, 12 Va. App. 476, 484 (1991) (en banc)). Additionally, "[t]he finder of fact may infer that a 'person intends the natural and probable consequences of his or her acts.'" *Johnson*, 53 Va. App. at 100 (quoting *Velasquez v. Commonwealth*, 276 Va. 326, 330 (2008)).

The same facts above that established the specific intent to kill for purposes of the attempted capital murder charge also establish that Thodos had the requisite intent for the aggravated malicious wounding charge. Beyond that, he acted aggressively to the officers when they tried to perform a pat down, and he pulled his firearm and started firing without warning. His use of a deadly weapon, in this case a firearm, allows the inference that he intended to maim, disfigure, or kill Deputy Gentry. *See Witherow v. Commonwealth*, 65 Va. App. 557, 571 (2015) ("'[A]n intent to maim, disfigure or kill may be' inferred from the use of a deadly weapon." (quoting *Williams v. Commonwealth*, 13 Va. App. 393, 398 (1991))). Thodos fired multiple shots—at least six—which demonstrates an intent to kill rather than scare the officers. Furthermore, Thodos continued to shoot at the officers even after he broke free from the officers and Deputy Gentry fell to the ground injured.

Thodos next argues that the evidence was insufficient to demonstrate that it was his firearm, rather than Deputy Ewing's, that caused Deputy Gentry's injuries. The video footage on its own supports the factfinder's judgment on this matter. *See Meade v. Commonwealth*, 74 Va. App. 796, 806 (2022) (holding that because appellate courts "owe deference to the trial court's interpretation of all of the evidence, including video evidence," this Court reviews video evidence on appeal "not to determine what [it] think[s] happened, but for the limited purpose of determining whether any rational factfinder could have viewed it as the trial court did"). The video shows that Deputy Gentry fell to the floor before Deputy Ewing was even able to pull his firearm from the holster. The video also shows that Deputy Ewing fell backwards at the same time that Deputy Gentry fell to the ground, and Ewing did not have a firearm in his hand at the time. Consistent with the video evidence, Deputy Ewing testified that he fell to the ground during the struggle with Thodos and that he had to regain his balance before he could draw his

weapon.  Accordingly, the evidence demonstrated that Thodos caused Deputy Gentry's injuries. Therefore, the evidence was sufficient to support the conviction of aggravated malicious wounding.

### 3.  Grand Larceny—Intent to Permanently Deprive

Thodos argues that the evidence was insufficient to support his conviction for grand larceny because there was no evidence that he intended to permanently deprive the truck owner of the vehicle.

Code § 18.2-95 prohibits "simple larceny not from the person of another of goods and chattels of the value of $1,000 or more."  "An individual commits larceny by wrongfully taking the property of another 'without his permission and with the intent to permanently deprive him of that property.'"  *McEachern v. Commonwealth*, 52 Va. App. 679, 684 (2008) (quoting *Stanley v. Webber*, 260 Va. 90, 96 (2000)).

"Intent is the purpose formed in a person's mind at the time an act is committed."  *Welch v. Commonwealth*, 79 Va. App. 760, 768 (2024) (quoting *Johnson*, 53 Va. App. at 100).  "A defendant's intent may be proved by circumstantial evidence, including the defendant's statements and conduct."  *Id.*  "In Virginia, absent countervailing evidence of an intention otherwise, 'the wrongful taking of the property in itself imports the *animus furandi*.'"  *McEachern*, 52 Va. App. at 685 (quoting *Bryant v. Commonwealth*, 248 Va. 179, 183 (1994)).  "In other words, the very existence of a trespassory taking permits the inference (unless other circumstances negate it) that the taker intended to steal the property."  *Id.*  That intent must exist at the time of the taking, and if it does, the offense is "complete, though the accused afterwards abandons" the property.  *Carter v. Commonwealth*, 280 Va. 100, 107 (2010).

Thodos relies on *Tarpley v. Commonwealth*, 261 Va. 251 (2001), where the Supreme Court found the evidence insufficient to support an intent to permanently deprive.  In *Tarpley*, the owner of the car drove it, with the defendant as a passenger, to an apartment complex where

10-15 people were gathered. *Id.* at 253. The driver got out and was "knocked unconscious," and the defendant ultimately moved into the driver's seat and tried to drive the car away before crashing it. *Id.* at 254. The defendant testified that he did not intend to steal the car, and he was simply trying to get away from the fight. *Id.* at 254-55. The Court found that the evidence was insufficient to establish the intent to permanently deprive. *Id.* at 256. The Court recognized that the factfinder could have rejected the defendant's testimony that he did not intend to steal the car, but the "balance of the evidence showed only that he did not try to obtain help before attempting to leave the apartment complex, and that he drove [the] car for a very brief period of time." *Id.* at 256-57. Thus, the evidence was insufficient to determine, without speculation, that there was an intent to permanently deprive the owner of his car. *Id.* at 257.

Here, the trespassory taking of the car permits the inference that Thodos intended to steal the car, and nothing in the circumstances negates such an inference. In *Tarpley*, the defendant was an acquaintance of the car owner, and he was in direct proximity to a fight, one in which he was not involved and was trying to escape. Here, Thodos stole a vehicle from a stranger, approximately a quarter of a mile from where he had been detained for shoplifting and shot a police officer. He drove the vehicle into a different county, and he engaged in a high-speed chase with law enforcement, abandoning the vehicle only after crashing it. Nor is there any testimony or evidence that Thodos intended to return the vehicle. Nothing about these circumstances negates the inference that he intended to steal the vehicle, nor are they similar to the facts in *Tarpley*. Accordingly, we find that the evidence was sufficient to demonstrate an intent to permanently deprive the owner of his vehicle.

### III. CONCLUSION

For these reasons, we affirm the decision of the trial court.

*Affirmed.*